## IN RE BARBARA J. ET AL.*
### (13735)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Supreme Court.

Argued February 28—decision released May 8, 1990

*Sara R. Martin,* for the appellant (respondent).

*Mary-Anne Mulholland,* assistant attorney general, with whom, on the brief, was *Judith Merrill Earl,* assistant attorney general, for the appellee (petitioner).

*Gail S. Kotowski,* for the minor children.

GLASS, J. Pursuant to General Statutes § 17-43a (a),[1] the commissioner of the department of children and youth services (DCYS), on April 6, 1988, filed three petitions to terminate the parental rights of Maureen J. to her children, Barbara J., Walter J. and Margaret J. In a bifurcated hearing, the trial court found that the allegations in the petitions had been proven by clear and convincing evidence and that it was in the best interest of each child that the parental rights of the mother be terminated. We find no error.

[1] General Statutes § 17-43a (a) provides in pertinent part: "In respect to any child committed to the commissioner of children and youth services in accordance with section 46b-129, either the commissioner, or the attorney who represented such child in the prior commitment proceeding, or an attorney appointed by the superior court on its own motion, or an attorney retained by such child after attaining the age of fourteen may petition the court for the termination of parental rights with reference to such child, including the right to petition the court for the revocation of the commitment of the child."

In its memorandum of decision, the trial court found that the petition pertaining to each child alleged that the reasons for the termination of the mother's parental rights had existed for not less than one year, and that the mother's parental rights should be terminated for three of the four grounds specified in § 17-43a (b),[2] namely: (1) that each child had been abandoned by the mother; (2) that each child in a prior proceeding had been found to have been neglected or uncared for, and that the parent had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and

---

[2] General Statutes § 17-43a (b) provides: "The superior court upon hearing and notice, as provided in sections 45-61d and 45-61f, may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that, with respect to any consenting parent, such parent has voluntarily and knowingly consented to termination of his parental rights with respect to such child or that, with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child; or (3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physicial, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. If the court denies a petition for consent termination of parental rights, it may refer the matter to an agency to assess the needs of the child, the care the child is receiving, and the plan of the parent for the child."

needs of each child, she could assume a responsible position in each child's life; and (3) that there was no ongoing parent-child relationship.

The birth dates of the children named in the petitions are as follows: Barbara, October 14, 1980; Walter, January 1, 1983; and Margaret, November 21, 1984. The children were committed to DCYS on November 2, 1985, as uncared for and neglected, and the commitment was extended for an eighteen month period on October 22, 1987. The termination of parental rights petitions were filed on April 6, 1988. On April 28, 1988, counsel for the respondent mother appeared and denied the allegations in each petition. Hearings on the merits of the petitions were held on July 20, 27 and 28, 1988.[3] At the hearings, the petitioner presented the testimony of three DCYS treatment workers, Patricia Williamson, Annette Rizzolo and Theresa Polverari, to whom the cases of the children had been successively assigned prior to the filing of the termination petitions. The petitioner also presented the expert testimony of Ellis A. Perlswig, a child psychiatrist. Exhibits included a report containing a psychological evaluation of the family by Perlswig, and four letters written to DCYS by Barbara's foster mother.

Williamson was the treatment worker from the date of commitment until April, 1986. During that time, the respondent, who had a history of mental illness, began counseling, and a weekly schedule of visitation was established with Barbara at the DCYS office, and with Walter and Margaret at their foster home. In her visits

---

[3] At the hearing on July 20, 1988, counsel for the petitioner requested permission to withdraw the petition as to each person named as father of each child named in the petitions. Since there was no evidence of paternity with respect to any of the alleged fathers, the trial court granted the petitioner's request and allowed each petition to be withdrawn as to the alleged fathers named therein. Each petition continued, however, as to the mother, Maureen J.

with Barbara, the trial court found that on some occasions the respondent would promise to make a home for her, and on other occasions she would make critical comments about her appearance. These events caused such a disturbance in Barbara that her foster mother could not control her. The respondent did not visit Barbara in December, 1985, and when she resumed visitation with her in January, 1986, Barbara again evidenced control problems. As a result, DCYS requested and obtained a suspension of the respondent's visits with Barbara for three months beginning on February 14, 1986. Barbara began counseling at this time.

Rizzolo was the treatment worker from April, 1986, until August, 1987. She testified that, when she took over, visits with the children were arranged at the office of DCYS. The respondent's visits with Barbara were reinstated in June, 1986, once per month, and semi-monthly with Walter and Margaret. The trial court found that, at these visits, the respondent paid little or no attention to the children. Instead, she spent most of the time talking to the treatment worker. In response to the suggestion of Barbara's therapist, the respondent's visitations with Barbara were suspended again in January, 1987, because of Barbara's disruptive behavior after the visits, which led to her admission to Highland Heights for day treatment. In April, 1987, Barbara's behavior deteriorated to the point where she was admitted to Highland Heights for in-patient treatment.

In August, 1987, the case was assigned to Polverari. She testified that the respondent's visits with Barbara continued once per month, and semi-monthly for Walter and Margaret. Polverari provided the respondent with transportation for visitations, although the respondent would not disclose her residence to Pol-

verari. The trial court found that visitations continued reasonably well until November, 1987, when the respondent disappeared and refused to disclose her whereabouts to DCYS. She reappeared in February, 1988, and, thereafter, until the filing of the petitions, had several visits with the children.

The trial court found that, from the date of the commitment to the time of trial, the respondent had lived in a variety of housing accommodations in New Haven. In July, 1985, she lived on Davenport Avenue. In November, 1985, she lived at a family shelter on Sylvan Avenue. Thereafter, she moved to Read Street. When she was evicted from there, she moved to Downing Street in the late spring of 1986. She lived at the YWCA shelter in the winter of 1986–87, and, in the summer of 1987, she moved to Hallock Avenue. The trial court found that, when the petitions were filed, the respondent's whereabouts were unknown, and service on her was by publication.

The trial court found further that, during the period between the commitment and the filing of the petitions, the respondent had attended several counseling sessions. She terminated counseling, however, and refused to continue after November, 1986. The trial court also found that, in the year prior to the filing of the petitions, the respondent had been employed at a pet store, and that she had maintained contact with the Hallock Avenue address. She did not, however, inform DCYS as to how she could be contacted, and visitations occurred only when she contacted DCYS.

The petitioner also presented the testimony of Perlswig. The trial court admitted into evidence a report prepared by Perlswig, which contained a psychological evaluation of the respondent and the children. This report, dated February 2, 1988, referred to interviews with the respondent and the children that had been con-

ducted by Perlswig from April 27, 1987, through June 24, 1987. The report also included an evaluation of Margaret by Linda C. Mayes, a pediatrician, that was conducted in June, 1987, and an evaluation of Walter by Fred Volkmar, a physician, that was conducted in May, 1987. Perlswig stated in his report that he had also reviewed eight other reports on the family dating back to 1982.

The trial court noted that Perlswig concluded that the respondent "suffers from a severe mental disorder that seriously interferes with her capacity to care for, nurture, and protect the children. She has a diagnosis of schizophrenia which is expressed in fragmentation of her thinking, with delusional and paranoid ideation. Her illness prevents her from providing safe and appropriate care for her children. . . . [The respondent] is in need of psychiatric treatment and medication which she has refused." He described schizophrenia as a disruption of the thinking process, and opined that, at the time of commitment, it had been important for the respondent to be in treatment and take medication, but that now it was probably too late. He also noted that, in his interviews with the respondent and the children, the children did not recognize the respondent as their mother. The trial court found further that Perlswig was of the opinion that the chaotic environment in which the children had spent their early lives had retarded the development of their intellectual and motor skills to the extent of possibly permanent damage. In the opinion of Perlswig, the respondent was unable to parent children, and has never been able to provide the continuity and consistency of care that is required by young children.

After the conclusion of the adjudicatory hearings, the trial court, on January 24, 1989, filed a memorandum of decision wherein it found that the petitioner had, pur-

suant to § 17-43a (b), "established each ground for termination by clear and convincing evidence." On May 2, 1989, the trial court filed a second memorandum of decision wherein, after making the six specific findings required by § 17-43a (d),[4] it found that it was "in the best interest of each of the children that the parental rights of the [respondent] be terminated." The trial court then rendered judgment terminating the parental rights of the respondent in and to Barbara J., Margaret J. and Walter J.

On appeal, the respondent claims that the trial court erred: (1) in admitting letters from Barbara's foster mother as business records; (2) in admitting the report of Perlswig as a full exhibit without examining the portions that were based on hearsay evidence; (3) in finding abandonment without sufficient evidentiary support; (4) in not using the findings prescribed by

---

[4] General Statutes § 17-43a (d) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (3) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communicatioins or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (6) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

§ 17-43a (d) to establish a failure to rehabilitate; and (5) in finding no ongoing parent-child relationship without sufficient evidentiary support.

I

The respondent's first claim is that the trial court erred in admitting into evidence letters from Barbara's foster mother to the DCYS treatment worker. We disagree. Specifically, at the hearings, the attorney for the children offered into evidence four letters sent to Barbara's DCYS treatment worker by her foster mother. The letters concerned, in part, the causal relationship between Barbara's disruptive behavior and visits with her mother. Counsel for the respondent objected to the proffered evidence, claiming that the letters were inadmissible hearsay and gratuitous communications from one who had no duty to report to DCYS. In an effort to overcome the objections by counsel for the respondent, the children's attorney made several foundational inquiries[5] of the DCYS treatment worker. On the basis of the worker's response to the inquiries, the court admitted the letters into evidence as business records. Notwithstanding the DCYS worker's responses to the preliminary inquiries, and the trial court's finding that the letters were business records, the respondent still argues that the foster mother had no duty to make any reports to DCYS about Barbara, and, therefore, the letters were not admissible as business records.

---

[5] The following foundational inquiries were made to the DCYS treatment worker by counsel for the children: "Were the letters received by you at DCYS? Were they made part of the official case file on these children? Is it customary for foster parents to prepare letters of concern or notes and submit them to the DCYS worker assigned? When a DCYS worker leaves a case, does the worker notify the foster mother of the new worker's name so [the foster mother] can submit reports? Is it their responsibility and obligation to do so? Is it part of their contract?"

The treatment worker responded in the affirmative to all of these questions.

We have stated: " 'To be admissible under the business record exception of General Statutes § 52-180,[6] "the business record must be one based upon the entrant's own observations or upon information transmitted to him by an observer whose business duty it was to transmit it to him." *D'Amato* v. *Johnston,* 140 Conn. 54, 59, 97 A.2d 893 (1953). Statements obtained from volunteers are not admissible though included in a business record because it is the duty to report in a business context which provides the reliability to justify this hearsay exception. Id. Information in a business record obtained from a person with no duty to report is admissible only if it falls within another hearsay exception. *State* v. *Palozie,* 165 Conn. 288, 295, 334 A.2d 468 (1973).' *State* v. *Sharpe,* 195 Conn. 651, 663–64, 491 A.2d 345 (1985)." *State* v. *Milner,* 206 Conn. 512, 521, 539 A.2d 80 (1988).

The respondent recognizes in her brief, however, that there is a statutory duty, pursuant to General Statutes § 17-36,[7] for custodians of children to file reports to

---

[6] The business records statute, General Statutes § 52-180, provides in pertinent part: "ADMISSIBILITY OF BUSINESS ENTRIES AND PHOTOGRAPHIC COPIES. (a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.

"(b) The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility."

[7] "[General Statutes] Sec. 17-36. CUSTODIANS OF CHILDREN TO FILE REPORTS. PLACING OF CHILDREN IN FOSTER HOMES. The institutions having custody of such children and the agencies and persons licensed by author-

DCYS "at such reasonable times and in such form and covering such data as said commissioner [of DCYS] directs." Nonetheless, she argues that the letters were not business records under § 52-180 because "the [DCYS] worker admitted that there was no formal or regular schedule of contact between herself as a case worker and a foster parent . . . and she does not impose a particular reporting format on a foster parent." This argument, however, misses the mark. Given the express statutory requirement that custodians of children "shall make such reports" as the "commissioner [of DCYS] directs," the fact that the worker does neither impose a particular reporting format on a foster parent, nor expect the duty uniformly to be observed by foster parents, will not vitiate or weaken the express duty imposed on foster parents by § 17-36. Moreover, under General Statutes § 17-37,[8] the commissioner of DCYS is required to exercise careful supervision of each child in his care, maintain contact with the child and foster parents and maintain such records as are necessary for the proper supervision of children under his guardianship or care. The duty of the foster parent to make the

---

ity of this chapter shall make such reports to said commissioner at such reasonable times and in such form and covering such data as said commissioner directs. The commissioner and his deputy and agents shall supervise the placing of such children in foster homes. Said commissioner may place children who have not been properly placed in homes suitable for their care and protection. In placing any child in a foster home, said commissioner shall, if practicable, select a home of like religious faith to that of the parent or parents of such child, if such faith is known or ascertainable by the exercise of reasonable care."

[8] "[General Statutes] Sec. 17-37. SUPERVISION OF CHILDREN UNDER GUARDIANSHIP OR CARE OF COMMISSIONER. The commissioner of children and youth services, or any agent appointed by him, shall exercise careful supervision of each child under his guardianship or care and shall maintain such contact with the child and his foster parents as is necessary to promote the child's safety and his physical, educational, moral and emotional development. He shall maintain such records and accounts as may be necessary for the proper supervision of all children under his guardianship or care."

reports required under § 17-36, and the duty of the commissioner to receive reports and maintain records of his supervision and care of children as provided under §§ 17-36 and 17-37, all enable the commissioner to perform his duty regarding children under his care. In sum, the trial court did not err in finding that Barbara's foster mother had a duty to make reports to the DCYS treatment worker. Therefore, the foster mother's letters to the DCYS treatment worker were admissible business records under § 52-180.

## II

Next, the respondent claims that the trial court erred by admitting the report of Perlswig as a full exhibit, without examining the portions of the report that were based on hearsay evidence. We are not persuaded. Prior to admitting the report into evidence, over the respondent's objection, the court inquired:

"The Court: All right. This report you prepared, Doctor, does this represent the summation of your views with respect to this matter and your opinions?

"Dr. Perlswig: I believe that it does.

"The Court: All right. Overruled. Exception noted. Full exhibit."

The report made reference to interviews conducted by Perlswig with the respondent and the children. In preparing his report, however, Perlswig had relied upon evaluations of Margaret and Walter by Mayes and Volkmar, respectively, as well as eight other reports on the family dating back to 1982. The respondent argues that "[m]ost of the sources would not be admissible in themselves, without the authors' presence for cross-examination."

"The fact that an expert opinion is drawn from sources not in themselves admissible does not render

the opinion inadmissible, provided the sources are fairly reliable and the witness has sufficient experience to evaluate the information. *Vigliotti* v. *Campano,* 104 Conn. 464, 133 A. 579 (1926); *Schaefer, Jr. & Co.* v. *Ely,* 84 Conn. 501, 508, 80 A. 775 (1911). An expert may base his opinion on facts or data not in evidence, provided they are of a type reasonably relied on by experts in the particular field. *State* v. *Cuvelier,* 175 Conn. 100, 107–108, 394 A.2d 185 (1978); see Fed. R. Evid. 703. This is so because of the sanction given by the witness's experience and expertise. *Burn* v. *Metropolitan Lumber Co.,* 94 Conn. 5, 6, 107 A. 609 (1919)." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed.) § 7.16.8 (c). "[W]hen the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise." *United States* v. *Williams,* 447 F.2d 1285, 1290 (5th Cir. 1971), cert. denied, 405 U.S. 954, 92 S. Ct. 1168, 31 L. Ed. 2d 231 (1972). The better reasoned authorities favor the admissibility of expert opinion that is partly derived from written sources. See, e.g., *Jenkins* v. *United States,* 307 F.2d 637, 641 (D.C. Cir. 1962); 2 J. Wigmore, Evidence (Chadbourn Rev. 1979) § 665b (3).

It is significant to note that the respondent has not challenged Perlswig's qualification as an expert. Moreover, Perlswig's affirmative response to the court's inquiry concerning whether his report was a "summation of [*his*] *views* . . . and . . . *opinions*" with respect to this matter strongly supports the inference that whatever "views" and "opinions" expressed by Perlswig in his report or in his testimony were his own "views" and "opinions" regardless of the documents or other data examined by him. (Emphasis added.) Furthermore, Perlswig was available for cross-examination

concerning his report, and the respondent has not claimed that her cross-examination of Perlswig was in any way restricted. Consequently, we conclude that the trial court did not err in admitting Perlswig's report into evidence.

### III

Finally, the respondent has challenged all three grounds, as alleged by the petitioner and found by the trial court, for the termination of her parental rights. Because the grounds for termination of parental rights listed in § 17-43a (b) are in the alternative, our conclusion of no error on any one of the grounds makes it unnecessary to address any of the other grounds found by the trial court for the termination of the respondent's parental rights. *In re Juvenile Appeal (84-BC)*, 194 Conn. 252, 258, 479 A.2d 1204 (1984); *In re Juvenile Appeal (83-BC)*, 189 Conn. 66, 69, 454 A.2d 1262 (1983).

" 'The termination of parental rights is defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . . " General Statutes § 17-32a (e) (Rev. to 1972) [now § 45-61b (g)]. Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 [1972]; see *In re Appeal of Kindis,* 162 Conn. 239, 240, 294 A.2d 316 [1972]; *Cinque* v. *Boyd,* [99 Conn. 70, 82, 121 A. 678 (1923)].' *Anonymous* v. *Norton,* 168 Conn. 421, 425, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). Termination of parental rights is 'a most serious and sensitive judicial action.' Id., 430.

" 'Section 17-43a carefully sets out . . . four situations that, in the judgment of the legislature, constitute "countervailing interests" sufficiently powerful to justify the termination of parental rights in the absence of consent. The commissioner of children and youth services, in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. No all-encompassing "best interests" standard vitiates the requirement of compliance with the statutory criteria. See *Alsager* v. *District Court of Polk County,* [406 F. Sup. 10 (S.D. Iowa 1975), aff'd, 545 F.2d 1137 (8th Cir. 1976)]; *In re Adoption of Children by D.,* 61 N.J. 89, 293 A.2d 171 (1972); *Malpass* v. *Morgan,* 213 Va. 393, 192 S.E.2d 794 (1972); Ketcham & Babcock, "Statutory Standards for the Involuntary Termination of Parental Rights," 29 Rutgers L. Rev. 530, 539 (1976); comment, "Termination of Parental Rights in Adoption Cases: Focusing on the Child," 14 J. Fam. L. 547, 550 (1975).' *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 671–72, 420 A. 2d 875 (1979)." *In re Luis C.,* 210 Conn. 157, 164–65, 554 A.2d 722 (1989).

Section 17-43a (b) provides in pertinent part: "The superior court upon hearing and notice . . . may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to any nonconsenting parent, over an extended period of time, which . . . shall not be less than one year . . . (2) the parents of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of per-

sonal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child . . . . '' The petitioner makes the following allegations regarding each child in each petition: "The child has been found in a prior proceeding to have been neglected or uncared for. The parents have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child. . . . The previous reason(s) has/have existed for not less than one year." The trial court found that the petitioner established this ground in the petitions by clear and convincing evidence.

The only challenge asserted by the respondent against this finding is that the trial court's determination regarding her failure to rehabilitate herself was clearly erroneous because the trial court made the six specific findings pursuant to § 17-43a (d) at the disposition hearing instead of at the adjudicatory hearing. In reliance on *In re Shavoughn K.*, 13 Conn. App. 91, 534 A.2d 1243 (1987), cert. denied, 207 Conn. 805, 540 A.2d 374 (1988), and *In re Shannon S.*, 41 Conn. Sup. 145, 562 A.2d 79, aff'd, 19 Conn. App. 20, 560 A.2d 993 (1989), the respondent argues that the six factors listed in § 17-43a (d) must be considered at the adjudicatory stage in a determination of failure to rehabilitate pursuant to § 17-43a (b) (2). We recognize that in *In re Shavoughn K.*, the Appellate Court stated: "In determining whether the parent has failed to rehabilitate herself to the extent that she could assume a responsible role in her children's lives, the court must consider the six factors listed in General Statutes § 17-43a (d); see *In re Rayna M.*, 13 Conn. App. 23, 31–32, 534 A.2d 897 (1987)." *In re Shavoughn K.*, supra, 98. This Appel-

late Court statement was repeated in *In re Shannon S.*, supra, 154. We have examined *In re Rayna M.*, *In re Shavoughn K.* and *In re Shannon S.*, for some authority or analysis that supports this proposition. Our examination and search, however, have been unsuccessful. *In re Shavoughn K.* cites *In re Rayna M.*, but the *In re Rayna M.* reference is to a discussion of an amendment to § 17-43a (b) (2) concerning a language change from "at some future date" to "within a reasonable time" that a parent could assume a responsible position in the life of the child. See *In re Rayna M.*, supra, 31–32. In fact, *In re Rayna M.* does not mention § 17-43a (d) and its six required findings at all. Thus, insofar as *In re Shavoughn K.* is applied to this case, we disagree with its reasoning.

We therefore hold that a termination of parental rights judgment must be based on compliance with the statutory requirements of § 17-43a. A finding that the petitioner has proven by clear and convincing evidence at least one of the statutory alternatives listed in § 17-43a (b) is a predicate for consideration of the six factors listed in § 17-43a (d). We do not construe § 17-43a (b) (2) as requiring consideration any different from the remainder of § 17-43a (b). Whether the six factors listed in § 17-43a (d) are expressly considered in conjunction with or subsequent to the trial court's determination of whether the petitioner has produced the statutorily required proof of at least one of the alternatives listed in § 17-43a (b) is without significance as long as no judgment of termination is rendered until after there has been full compliance with § 17-43a. Although § 17-43a does not mandate a bifurcated hearing, it does command a termination decision that clearly identifies the concerns of subsections (b) and (d). Bifurcating the termination decision, however, enables the trial court to focus clearly on the statutory requirements of each subsection.

In the present case, inasmuch as the trial court meticulously made all of the statutorily required findings for the adjudications under § 17-43a (b) (2), and, thereafter made all of the enumerated findings mandated under § 17-43a (d), we discern no substantive significance to the fact that the termination decision was bifurcated. Consequently, we find no error in the action of the trial court in rendering its termination decision after the bifurcated hearing.

Our conclusion of no error regarding this finding makes it unnecessary for us to consider the claims of error regarding the other findings that the trial court used as a basis for the termination of the respondent's parental rights. See *In re Juvenile Appeal (84-BC)*, supra, 258; *In re Juvenile Appeal (83-BC)*, supra, 69.[9]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[9] The respondent does not argue on appeal that there was insufficient evidence to support the trial court's finding of failure to rehabilitate pursuant to General Statutes § 17-43a (b) (2). Nevertheless, even if she had made this argument we would have concluded that there was sufficient evidence to support the trial court's finding. In particular, the trial court found that the respondent: (1) visited the children sporadically; (2) refused to seek psychiatric treatment; (3) refused to divulge her whereabouts; (4) failed to appear at the hearings. Furthermore, Perlswig concluded: (1) that the mother has never been able to provide the continuity and consistency of care that is required by young children; and (2) that even if she were to seek psychiatric treatment at present, it would "probably [be] too late."