[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I
On December 11, 1989, the Commissioner of the Department of Children and Youth Services ("DCYS") filed a Petition For Termination of Parental Rights seeking to terminate the parental rights of Beverly A. and Santos A. ("Santos, Sr.") in their son, Santos A. ("Santos, Jr."). Jurisdiction is invoked pursuant to Conn. Gen. Stat. 17-43a(a), the child having previously been committed to DCYS pursuant to 46b-129.[1] The Petition alleges the existence for not less than one year of all four grounds for the nonconsensual termination of parental rights set forth in 17-43a(b). Santos, Sr., who was properly served by registered mail at his out-of-state address, has never appeared, and the case as to him is essentially uncontested. In contrast, Beverly, who has appeared and been represented by able counsel, has vigorously contested the case against her. For the reasons set forth below, the Court has concluded that the parental rights of both parents should be terminated. All findings have been proved by the constitutionally required standard of clear and convincing CT Page 2838 evidence. See Santosky v. Kramer, 455 U.S. 745 (1982); Practice Book 1049.
 II.
Before proceeding to the merits of the case, it is appropriate to briefly describe its structure. Although there was a unified hearing in this case, on August 28, 1989, there are two phases to the Court's consideration of each parent's case. In the adjudicatory phase, the Court determines the validity of the specific grounds alleged in the Petition and, consequently, is limited to events preceding the filing date of December 11, 1989. If one or more of the adjudicatory grounds are proven by clear and convincing evidence, the Court is obliged to move to the dispositive phase. This latter phase is concerned with what action should be taken in the best interest of the child and, as to that phase, the Court may consider matters occurring up to the date of the trial. See In re Shannon S., 41 Conn. Sup. 145, 146,562 A.2d 74, aff'd, 19 Conn. App. 20, 560 A.2d 993 (1989). The six factors listed in 17-43a(b) must be expressly considered in the dispositional phase. In re Barbara J., 215 Conn. 31, 47,574 A.2d 203 (1990).
 III.
(A)
The case of the father, Santos, Sr., is clear-cut. Carolee Earle, the DCYS social worker assigned to this case, credibly testified that Santos, Sr. has had no contact with Santos, Jr. since October 1988. As stated above, the father has never appeared in or contested this action in any way. The Court finds that, under the circumstances, this is an incontrovertible case of abandonment "in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." 17-43a(b)(1). The Court's finding that the petitioner has proven this adjudicative alternative by clear and convincing evidence allows the Court to proceed to the dispositional phase of the father's case, see In re Barbara J., supra, 215 Conn. at 47, and the Court finds it unnecessary to consider the other adjudicative alternatives presented.
(B)
With respect to the termination factors listed in 17-43a(d), the Court finds: (1) From March 1987, when this case first came to the attention of DCYS, to the fall of 1988, when Santos, Sr. left Connecticut to live in New York, DCYS offered a variety of services to the father to facilitate his reunion with his child, including a parent aide, counseling, and transportation. (State's CT Page 2839 Ex. I, J, K M.) When Santos, Sr. left the state, he apparently lost all interest in his son and effectively abandoned him. DCYS' offers of services were consequently discontinued. (2) On November 17, 1987, when Santos, Jr. was committed to DCYS as uncared for, the Court ordered the father to obtain therapy and to visit his son on a schedule approved by the therapist. The father fulfilled his obligations under this order indifferently at best until October 1988 and not at all thereafter. (3) The record indicates that Santos, Jr. has no feelings or emotional ties with respect to his father other than a general awareness that his father exists. As discussed in greater detail below, Santos, Jr. has effectively bonded with his foster family. (4) Santos, Jr. was born on November 27, 1983. (5) Since October 1988, Santos, Sr. has made no effort whatsoever to adjust his circumstances, conduct, or conditions to make it in the best interest of his son to return him to his home in the forseeable future. (6) Santos, Sr. has not in any way been prevented from maintaining a meaningful relationship with his son by the unreasonable act or conduct of Beverly or the unreasonable act of any other person or by his economic circumstances.
For all of these reasons, the Court concludes that it is in the best interest of the child to terminate the parental rights of Santos, Sr.
 IV.
(A)
In contrast to the case of the father, the case of the mother, Beverly A., has been vigorously contested. In deciding her case, the Court has heard and considered the testimony of David M. Mantell, a clinical psychologist who examined Beverly and Santos, Jr. on different dates in April 1990; Arnold Trasente, another clinical psychologist who had seen Santos, Jr. on a weekly basis from November 1989 to the time of trial and who supervised a meeting between Beverly and Santos, Jr. on February 21, 1990; Marion J. Fontanella, the Program Director of the Coordinated Crisis Intervention Program in Meriden, which provided services to Beverly from 1987 to 1989; Marlene Pietrowski, Santos, Jr.'s teacher from December 1988 to June 1990 at the Simon Lakes School in Milford; Jeannette R., Santos, Jr.'s foster mother since August 1988; Carolee Earle, the DCYS worker assigned to this case since its inception in March 1987; Beverly A.; and Beverly's mother, Helen R. The Court has also read and considered a number of documentary exhibits, viz. a Psychological Report prepared by Dr. Mantell on April 24, 1990 (State's Ex. A); seven semiannual DCYS Treatment Plans prepared from April 2, 1987 to April 2, 1990 (State's Ex. B-H); five Service Agreements entered into between DCYS and Beverly from March 6, 1987 to April 22, 1989 (State's Ex. CT Page 2840 I-M); and Ms. Earle's Study For Termination of Parental Rights filed with the Court on May 1, 1990 (State's Ex. N).[2] The Court also takes judicial notice of the procedural history of this case established by the documents in its file. On the basis of all of this evidence, the Court finds that the following facts have been established by clear and convincing evidence.
Beverly was born in Meriden in 1966. When she was sixteen (this must have been in 1982) she had a child, Lucille R., by a man not otherwise involved in this case. When she was eighteen, she met Santos, Sr. Santos, Jr., the first child of their union, was born on November 27, 1983. On March 17, 1984, Beverly married Santos, Sr. They subsequently had two more children — Melissa A., born on August 24, 1985; and Antonio A., born on September 30, 1986.
Santos, Jr., required special care as an infant. A few days after his birth he stopped breathing and was rushed to the hospital. For the next five months he was attached to a monitoring device which would flash a green light when he stopped breathing. The light flashed frequently. After he outgrew this particular syndrome, he became a very difficult child. He would assault his siblings, break things in the house, and refuse to obey his parents. At the same time (and this may well have been a primary cause of his destructive behavior) he was physically abused by Santos, Sr.[3]
In March 1987, when Santos, Jr. was three years old, DCYS received a report that he had been abused. Ms. Earle investigated and found bruises and marks of undetermined origin on his body. On March 6, 1987, the parents and DCYS signed a Service Agreement in which the parents agreed to attend counseling and not to use abusive discipline on the children. (State's Ex. I.) The parents made an intake appointment at the Coordinated Crisis Intervention Program (CCIP) and agreed to accept parent aide services.
On June 17, 1987, Beverly told Ms. Earle that she wanted to place Santos, Jr. because she was afraid that his father might hurt him. On that date the parents signed voluntary placement papers and a Service Agreement (State's Ex. J) in which they agreed to use parenting skills learned at CCIP and to visit Santos, Jr. regularly and DCYS agreed to assist them with transportation. Santos, Jr. was placed with a foster family in New Haven.
On September 18, 1988, DCYS filed a neglect Petition alleging that Santos, Jr. was neglected and uncared for in that he had been abused in the past and that the parents had not complied with the Service Agreement. On November 17, 1987, by agreement, Santos, Jr. was adjudicated to be uncared for on the basis of the CT Page 2841 specialized care he required and committed to DCYS for a period of eighteen months. The court ordered the parents to obtain therapy and to visit Santos, Jr. as the therapist allowed. On November 26, 1987, the parents entered into a third Service Agreement with DCYS (state's Ex. M) in which they agreed to participate in individual and family counseling and to accept a parent aide and DCYS agreed to submit payments for train fare every other week.[4]
By April 1988, some grounds for optimism existed. The parents had begun therapy at Meriden-Wallingford Hospital, had accepted a parent aide, and had visited Santos, Jr. on a more or less regular basis. By the fall of 1988, however, the parents' situation, and with it their already tenuous relationship with Santos, Jr., had deteriorated significantly. Santos, Sr. left Beverly to live in New York. Beverly was evicted from her apartment. The parents were terminated from their therapy program due to non-attendance, and parent-aide services were discontinued "due to lack of movement." (State's Ex. E.) Visitation with Santos, Jr., who in August 1988 was moved to the Milford foster home of Jeannette R., became infrequent. In all of 1988, Beverly visited Santos, Jr. twelve times. Most of those visits were in the first part of the year.
In March or April of 1989, Beverly signed yet another Service Agreement promising to visit Santos, Jr. as recommended by his therapist, to attend counseling, and to accept a parent aide. (State's Ex. L.) Within a few months of these promises, however, Beverly was to abandon Santos, Jr. by any definition of the word. She visited her son only twice in 1989 (testimony of Carolee Earle), the last visit being on May 18, 1989.
The events subsequent to the May 1989 visit were best described by Beverly in her own testimony in this case. One evening in June 1989 Santos, Sr. came to her home to bring her and her other three children to New York. In spite of the fact that it was about 10:00 P.M., Beverly immediately bundled up the three children still in her custody and took them on a midnight trip to New York to live with Santos, Sr. and his family. Beverly professed to see nothing even questionable in this rather remarkable spur-of-the-moment decision. Nor did she see anything wrong in her subsequent failure to inform DCYS of her move. In August, DCYS which had learned of her new address independently, sent her a letter saying that she could call its office collect. She then called DYCS once and did not call again until January 1900 "because they didn't say I had to respond." Although she also called Santos, Jr. once in August 1989, she did not write him because she "didn't have his address until [she] got unpacked after a couple of months."
The testimony was emblematic of Beverly's amazingly casual CT Page 2842 explanations for the manifold ways in which she abandoned her son. In the three years that Santos, Jr. has been in foster care, Beverly has never sent him a birthday card or a Christmas card or called him on his birthday, in spite of the fact that she has always known his address. In the first year she sent him birthday and Christmas presents, but no presents have followed thereafter. The reason for this was not, however, an inability to buy presents. Beverly assured the Court in her testimony that she had duly purchased birthday and Christmas presents for her son during the past two years but had never gotten around to sending them and that all of these presents are still in her house.
The abandonment has had an inevitable effect on Santos, Jr., who because of his various psychological needs and disorders, requires even more consistency in his environment than most children. He has, unsurprisingly under the circumstances, become bonded to his foster family. He rarely mentions Beverly, although he is obviously aware of her existence. On February 21, 1990, Beverly met Santos, Jr. in a meeting supervised by Dr. Trasente — their only meeting between May 1989 and the present. The meeting, itself passed without apparent incident, but a few days later both Dr. Transente and Jeannette R. observed a serious regression in Santos, Jr.'s behavior. He had a high anxiety level, was aggressive to other children, and wet and soiled his pants ten to fifteen times a day. This regression lasted for several weeks. There was no other incident known to either his therapist or foster mother that could have caused this regression.
Given this evidence, the Court makes the following adjudicatory conclusions based on the facts in existence on December 11, 1989.
(1) As of December 11, 1989, Santos, Jr. had been abandoned by Beverly in the sense that she had failed to maintain a reasonable degree of interest, concern or responsibility as to his welfare. "Abandonment focuses on the parent's conduct." In re Juvenile Appeal, 183 Conn. 11, 14, 438 A.2d 801 (1981). As our Appellate Court has observed,
 Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child. In re Luke G., 40 Conn. Sup. 316, 323, 498 A.2d 1054 (1985). Where a parent fails to visit a child, fails to display any love or attention for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred.
CT Page 2843
In re Migdalia M., 6 Conn. App. 194, 208-09, 504 A.2d 533 (1986). Moreover, as our Appellate Court has also explained, "General Statutes 17-43a(b)(1) does not contemplate a sporadic showing of the indicia of `interest, concern or responsibility for the welfare of the child.' A parent must maintain a reasonable degree of interest in the welfare of his or her child. `"Maintain" implies a continuing, reasonable degree of concern.' In re Migdalia M., supra, 210." In re Rayna M., 13 Conn. App. 23, 37-38,534 A.2d 897 (1987). For these reasons, the Court concludes that Beverly has abandoned Santos, Jr. within the meaning of 17-43a(b)(1).
(2) Between November 17, 1987, when Santos, Jr. was found to be uncared for by the Superior Court, and December 11, 1989, Beverly failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering Santos, Jr.'s age and needs, she could assume a responsible position in his life. Section 17-43a(b)(2) "requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and, further, that such rehabilitation must be forseeable `within a reasonable time.'" In re Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). In this case, Beverly has "failed to do anything which would encourage the belief that she could ever assume a responsible position" in Santos, Jr.'s life. In re Shavoughn K., 13 Conn. App. 91,99, 534 A.2d 1243 (1987), cert. denied, 207 Conn. 805,540 A.2d 374 (1988). She has been offered counseling services on numerous occasions, but her attendance at her scheduled sessions was sporadic at best, and by December 11, 1989, she had been out of the state (without any significant contact with DCYS) for months. See id. Moreover, in spite of her repeated promises to visit Santos, Jr., her visits had by December 11, 1989, declined from sporadic to nonexistent. See id. at 100. Dr. Trasente, Santos, Jr.'s therapist, credibly testified that Santos, Jr. is an overanxious child who has an exceptional need for consistency in his environment. Given these facts, the Court concludes that Beverly has achieved no degree of rehabilitation whatsoever that would encourage the belief that, within a reasonable time, she could assume a responsible position in her son's life.
(3) The Court does not find that Santos, Jr. has been denied, by reason of an act or acts of Beverly's commission or omission, the care, guidance or control necessary for his physical, education, moral or emotional well-being.
(4) As of December 11, 1989, there was no ongoing parent-child relationship within the meaning of 17-43a(b)(4),[5] and to allow further time for the establishment or re-establishment of such relationship would be detrimental to the best interest of the CT Page 2844 child. This inquiry falls into two parts: first, whether there was an ongoing parent-child relationship on December 11, 1989; and second, whether further time should be allowed for such a relationship to be re-established.
(a) With respect to the question of whether a parent-child relationship existed on December 11, 1989, a somewhat ambiguous early statement by our Supreme Court that "the ultimate question is whether the child has no present memories or feelings for the natural parent," In re Juvenile Appeal (Anonymous), 177 Conn. 648,670, 420 A.2d 875 (1979), must be read in the light of common sense and subsequent case law. See In re James T., 9 Conn. App. 608,616, 520 A.2d 644 (1987). "[T]he phrase `feelings for the natural parent' refers to feelings of a positive nature." In re Juvenile Appeal (84-6), 2 Conn. App. 705, 709, 483 A.2d 1101
(1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985). Moreover, the legislature has specified that the parent-child relationship in question must be an "ongoing" one of the sort "that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child." See n. 5, supra. Whatever the relationship between Beverly and Santos, Jr. was on December 11, 1989, it did not remotely resemble the relationship contemplated by the legislature. Although Santos, Jr. recognized Beverly as his biological parent, he did not recognize her as a parent in any psychological sense of the term. This is unsurprising, since Beverly has not met his various needs "on a day to day basis" for many years — and, probably, for as long as he can remember. It is important, here, to bear in mind a significant difference between children and adults:
 Unlike adults, children have no psychological conception of relationship by blood-tie until quite late in their development. For the biological parents, the facts of having engendered, borne, or given birth to a child produce an understandable sense of preparedness for proprietorship and possessiveness. These considerations carry no weight with children who are emotionally unaware of the events leading to their births. What registers in their minds are the day-to-day interchanges with the adults who take care of them and who, on the strength of these, become the parent figures to whom they are attached.
J. Goldstein, A. Freud A. Solnit, Beyond The Best Interests of the Child 12-13 (2d ed. 1979). These observations hold true in this case. The evidence presented to this Court establishes that contact with his biological mother is a cause of deep distress CT Page 2845 rather than nature and positive feelings for Santos, Jr. There is, consequently, no parent-child relationship within the meaning of this statute.
(b) Given the facts, the Court concludes that to allow further time for the establishment of a parent-child relationship would be detrimental to the best interest of the child. Dr. Mantell credibly testified to this Court that the establishment of a parent-child relationship in this case would take "years of very consistent hard work" and that it is not clear that such a goal would be achievable even then. Dr. Trasente credibly testified that any further visits between Santos, Jr. and his mother would be counterproductive because of Santos, Jr.'s enormous resistance to change and security needs. It may be that at some time when Santos, Jr. is much older — an adolescent or even an adult — he could muster the necessary emotional resources to establish a positive relationship with his biological mother, "but it is not, in the future but in the present that the decision about his future has finally to be made." In re K.D., [1988] 1 A.C. 806, 829 (H.L. 1988) (opinion of Lord Oliver). By the time that several more years have passed, it will simply be too late. "It is in the next few years in this little boy's life . . . when his character will be formed as a result of the emotional relationships which he successfully forms with his foster parents . . . and you cannot dig up children in the way that you dig up geraniums: they form emotional roots and those roots have to be preserved intact." Id. at 829-30. Under these circumstances, the allowance of further time for a relationship to be established would be detrimental to Santos, Jr.'s best interest.
(B)
With respect to the specific considerations for the termination of parental rights listed in 17-43a(d), the Court finds as follows:
(1) From March 1987, when this case first came to the attention of DCYS, until the late spring of 1989, when Beverly abruptly left Connecticut for New York, DCYS offered Beverly and Santos, Jr. a variety of services to facilitate their reunion. During this time, Beverly and DCYS entered into five separate service agreements (State's Ex. I-M), in which Beverly repeatedly agreed to accept counseling and parent aides arranged by DCYS, and DCYS agreed to assist her with transportation. The evidence presented in this case establishes that assistance with transportation was, in fact, provided. As discussed above, Beverly at first complied with her various promises sporadically, and then not at all.
(2) On November 17, 1987, when Santos, Jr. was committed to CT Page 2846 DCYS as uncared for, the Court ordered Beverly to obtain therapy and to visit Santos, Jr. as approved by the therapist. As discussed above, Beverly at first complied with these orders sporadically and then not at all.[6]
(3) Santos, Jr. is aware of his biological mother's existence, but does not regard her as a parent in any psychological sense. Both expert and lay testimony presented to the Court establishes that Santos, Jr. has no positive emotional ties to Beverly. On the other hand, the evidence — again, both expert and lay — firmly establishes that Santos, Jr. has developed significant emotional ties to his foster parents and is bonded to them.
(4) Santos, Jr. was born on November 27, 1983, and was thus six years and nine months old on the date of the trial.
(5) Beverly has made sporadic — and, in the past year, virtually nonexistent — efforts to adjust her circumstances, conduct, and conditions to make it in the best interest of Santos, Jr. to return him to his home in the forseeable future. The sad history of her efforts — or lack thereof — has been recounted above. The Court specifically notes that: (A) Beverly has at no time "maintained contact" with her son within the meaning of 17-43a(d)(5)(A). Her visitation has, at best, been incidental. Her communications — other than the sporadic visits themselves — and contributions have been virtually nonexistent; (B) Beverly has at no time maintained regular contact or communication with DCYS. Such contact has, again, declined from sporadic to nonexistent.[7]
She has never maintained any significant contact with Santos, Jr.'s foster parents.
(6) Beverly has never been prevented from maintaining a meaningful relationship with Santos, Jr. by the unreasonable act or conduct of Santos, Sr. or the unreasonable act or any other person. DCYS has, in the recent past, denied a visit prior to a court hearing, see n. 6, supra, but that was because Santos, Jr.'s therapist advised that such a visit would be detrimental to him, and this act was, under the circumstances, hardly unreasonable. Beverly's economic circumstances undoubtedly hindered her to some degree in her ability to contact DCYS or participate in visiting or counseling. (She did not have either a car or a telephone during the relevant period of time.) On the other hand, poverty is simply no excuse for the gross dereliction of parental duty that occurred in this case. Three examples will suffice. Beverly did not attend counseling in spite of the fact that it was an easy walk from her home. By her own testimony, she was able to purchase birthday and Christmas presents for her son but did not bother to send them. And, most telling, she was able to pack up and move to New York on a moment's notice but was unmotivated to CT Page 2847 contact either DCYS or her son for months on end. Under these circumstances, the Court cannot conclude that Beverly's failure to maintain a meaningful relationship with her child was the result of economic circumstances. The only unreasonable acts here are the numerous unreasonable acts of Beverly herself.
In addition to these factors, the Court has also considered the expert testimony of the two examining psychologists who testified in this case — Drs. Mantell and Trasente — both of whom believe that further contact between Beverly and Santos, Jr. would be contrary to Santos, Jr.'s best interest and the position of Santos, Jr.'s attorney, who believes that termination is appropriate "[b]ecause of Santos' dire need for a stable home and relationships."[8]. Of course, the ultimate decision as to the child's best interest must be made by the Court upon a full consideration of all of the evidence. After such a consideration, and on the basis of clear and convincing evidence, the Court concludes that a termination of parental rights is mandated by the best interest standard in this case. It simply is not in Santos, Jr.'s best interest to have further contact, or a legal relationship, with his biological mother under these circumstances. A termination of Beverly's parental rights will provide the stability for Santos, Jr. which he so desperately needs.
 V.
For the foregoing reasons, a termination of the parental rights of Santos, Sr. and Beverly in their minor child, Santos, Jr., is ordered.
As to Santos, Sr., who has never appeared, the Court orders a copy of this decision to be sent by certified mail to his last known address in New York. In addition, since there was some testimony that Santos, Sr. may have recently moved back to Meriden, the Court orders a notice of this decision to be published in an appropriate Meriden newspaper.[9]
Pursuant to 17-43a(f), it is further ordered that the Commissioner of DCYS be appointed statutory parent so that Santos, Jr. can be placed in adoption. Pursuant to 17-43a(i), the statutory parent shall report to the Court within ninety days on a case plan for the child. It shall then submit reports every six months thereafter until such time as any proposed adoption plan has become final.
JON C. BLUE JUDGE OF THE SUPERIOR COURT