[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I
On October 27, 1995 the Department of Children and Families (hereinafter DCF) filed a petition seeking to terminate the parental rights of the biological parents of Drew R. Drew was born on April 10, 1993 and has been in placement with DCF since he was four days old. He initially was placed by his mother. DCF alleged all four non-consensual grounds existed, and had existed for more than one year, to support its petition.
On December 8, 1995 the court granted DCF's oral amendment to the petition to add consent as a separate allegation for mother alone. After a thorough canvass of mother's counsel regarding mother's sworn written consent, the court confirmed notice on mother by personal service, accepted her written consent, and terminated mother's parental rights in and to her son Drew.
As to father, he failed to appear for the petition's initial hearing on December 8, 1995. No proof of service was provided. Counsel was appointed for father, and the matter was continued. The matter was scheduled for trial on April 29, 1996, as well as May 2, 1996 and May 16, 1996. Father traveled from Los Angeles, California for the first two trial dates, and was excused from appearing for the third day.
At trial the court heard testimony from Natalie Racine and Tara Colbert, both DCF workers; father; Drew's former foster mother; and Drew's current foster mother.
II CT Page 7936
The general authority of the Superior Court to terminate parental rights to committed children such as Drew is now found in General Statutes § 17a-112(b), which provides, in pertinent part, as follows:
 The superior court upon hearing and notice . . . may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to any non-consented parent, [the circumstances giving rise to the need for termination have existed] over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year.
The question of termination of parental rights was recently discussed in the case of In re Jessica M., 217 Conn. 459 (1991), where the court, at pages 464, 465 and 466, stated in part as follows:
 Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); see also In re Juvenile Appeal (83-CD), 189 Conn. 276, 295, 455 A.2d 1313 (1983) (noting that "it is both a fundamental right and the policy of this state to maintain the integrity of the family"). Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
. . .
As a matter of statutory fiat, consideration of the CT Page 7937 best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination. In re Barbara J., 215 Conn. 31, 45, 574 A.2d 203 (1990); In re Luis C., 210 Conn. 157, 165, 554 A.2d 722 (1989); In re Juvenile Appeal (Anonymous),
supra, 177 Conn. 771-72; see also O. Ketcham and R. Babcock, Statutory Standards for the Involuntary Termination of Parental Rights," 29 Rutgers L. Rev. 530, 539 (1976). We have observed, however, that (i)nsistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not inconsistent with concern for the best interests of the child." In re Juvenile Appeal (Anonymous), supra, 177 Conn. 672. A child, no less than a parent, has a powerful interest in the preservation of the parent-child relationship. Santosky v. Kramer, supra, 760.
In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition by clear and convincing evidence. In re Theresa S., 196 Conn. 18
(1985). The ground alleged for termination of mother's rights regarding these boys is based on General Statutes § 17a-112(b), Subsections (1) and (4).
If the petitioner meets its burden, the court must then decide whether termination of parental rights is in the best interests of the child, and in doing so, the court must consider and make findings in writing of the six factors set out in General Statutes § 17a-112(d). If the court decides it is in the best interest of the child to terminate parental rights, the petition should be granted and the petitioner appointed the statutory parent of the child. The court does not consider the "child's best interests" unless grounds for termination have been proved by clear and convincing evidence.
The adjudication on the petition may consider facts as of the last day of filing or amending the petition, which in this case is October 7, 1995 as to father. In deciding the disposition, the court may consider facts as of the last date of trial including those facts contained in the mandatory social study. In re Juvenile Appeal, 192 Conn. 254 (1984).
 III
General Statutes § 17a-112(b)(1) provides for termination of parental rights if, with respect to a nonconsenting parent for a period of not less than one year, . . ."the child has been abandoned by the parent CT Page 7938 in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
Our Appellate Court explicated this ground when it stated: "The commonly understood general obligation of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to provide social and religious guidance."
"It is not lack of interest alone which is the criterion in determining abandonment. Abandonment under General Statutes [§ 17a[112](b)(1) requires failure to maintain interest, concern, or responsibility as to the welfare of the child. Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred."
"General Statutes [§ 17a-112(b)(1)] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing reasonable degree of concern. (Interior quotations omitted; interior citations omitted.) In re Rayna M., 13 Conn. App. 23,37-38 (1987).
The testimony of father, the two foster mothers, and the two DCF workers established that father's contact with Drew was random at best. He has not contributed to his child's support, though evidence indicates he could pay a small amount. Birthdays and holidays were acknowledged sporadically. Very few phone calls were made or letters sent inquiring after Drew. On one occasion when father traveled to Connecticut from Los Angeles, he did not visit Drew. Father was not involved with his son as of October 7, 1995.
The petitioner has proven abandonment by clear and convincing evidence.
 IV
The other ground for termination pursued by the petitioner was no ongoing parent-child relationship, meaning the relationship that ordinarily CT Page 7939 develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child, as set forth in General Statutes § 17a-112 (b)(4).
With reference to this ground, our Supreme Court said: "It is reasonable to read the language of `no ongoing parent child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his . . . parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced. In either case the ultimate question is whether the child has no present memories or feelings for the natural parent. In re Juvenile Appeal(Anonymous) v. Commissioner of Children Youth Services. 177 Conn. 648,670, 420 A.2d 875 (1979).
The evidence shows that Drew has been in the petitioner's care since he was four days old. During his life in foster care, he has had very limited contact with his father. However, there was evidence that Drew cried at the conclusion of his father's visit, that he had readily accessible a photo of his father, which he identified as "Daddy," and that he had present memories or feelings for his natural father.
The petitioner presented evidence that Drew had no real awareness that the respondent was his father, and that he responded with warmth and need to his father's visits simply because it was a visitor to the foster home coming to see Drew exclusive of the other children. The petitioner's evidence was that Drew cried frequently at the conclusion of any visit. The evidence is not clear and convincing that Drew's expressed positive feelings are not specific to the respondent as father, but rather general to the respondent as a visitor. Accordingly, this ground alleged by the petitioner must fail.
 V
Having determined in Part III that the petitioner established abandonment by father by clear and convincing evidence, the court must determine by the same standard that termination of father's parental rights is in Drew's best interest. In re Tabitha P., 39 Conn. App. 353,361-2 (1995). General Statutes § 17a-112 (d) mandates that the court consider and make written findings as to seven factors. These will be considered in turn, and as to each, the court finds the evidence proven by clear and convincing weight.
A. CT Page 7940
Drew has been in petitioner's care virtually since birth, and there was evidence that mother did not cooperate with DCF in locating father. Father said he learned of Drew's circumstances when Drew was approximately three months old. Father claims mother's misrepresentations of the factual situation and of her intentions kept him from contacting DCF for several months, and that any initial attempts to notify him by DCF failed. However, father clearly was aware of his son's custodial position when he wrote to DCF on June 12, 1994. After that contact, DCF put in place home studies, and made attempts to accommodate father's expressed desire for custody and interim visitation. Father, however, maintained no stable employment or address, so all attempts to facilitate reunion were thwarted by father's changed circumstances. These changes usually remained undisclosed to DCF for lengthy periods of time, until father randomly revealed them. As early as January 11, 1995, DCF put father on notice that his inability or unwillingness to take the requisite steps for reunification were jeopardizing his relationship with DCF and his son. Father was educated, a former employee of the State of Connecticut Department of Mental Retardation, and able to appreciate the importance of what was asked of him. DCF made reasonable efforts to reunify father and Drew; father's efforts were too inconsistent to warrant further effort by DCF.
 B.
As set forth in subparagraph A, DCF made reasonable efforts.
 C.
Father had not previously participated in any neglect proceedings, and no expectations or court orders were addressed to father.
However, father's record of limited compliance with DCF's requests for cooperation is noted by the court.
 D.
Drew has had two foster mothers with significant bonds to him. The first cared for him for just over the first two years of his life, along with other foster children. Due to Drew's having no significant family contacts, unlike her other foster children, she became overprotective of him and more involved with him. He called her "mommy" and her bond with him was reciprocated. He was removed because the presence of a unacceptable level of lead in his blood was discovered, which was traced to the physical condition of the foster home. He has been with his current foster mother since August of 1995. He calls her "mommy" as well. She has significant ties to Drew and remains committed to his care until a CT Page 7941 permanent home can be found. Neither foster mother is a candidate for adoption.
 E.
Drew was born April 10, 1993.
 F.
As previously indicated, father's contact with Drew has been sporadic and limited. His first foster mother testified that he sent no Christmas or birthday presents, made one visit with Drew outside of her home, and made few phone calls.
The second foster mother indicated a similar pattern of very limited and random communication. Father did send Christmas presents last year, but Drew's birthday in 1996 went unacknowledged by father. Father's only visit with Drew at her home occurred when father appeared in Connecticut for trial.
 G.
In addition to father's two visits in three years, father did make an attempt to visit when he obtained a round-trip ticket from Los Angeles to Newark, New Jersey. However, he had no funds to continue from New Jersey to Connecticut. He called DCF and was told that immediate transportation from Newark could not be arranged. Father returned to New Jersey that day. Father claims this quixotic attempt to visit is an example of the petitioner's inflexibility and unreasonable prevention of father maintaining a reasonable relationship with his son. Rather, the court views this as an exemplar of father's inability to make appropriate, reasoned plans for reunification.
Father also claims that Drew's mother interfered with his relationship. He testified that he and mother separated while Living in Detroit, Michigan while mother was pregnant with Drew. Mother returned to Connecticut, where she and father had mutual friends, both having lived and worked here during the early days of their relationship. Father says mother misled him as to her whereabouts, Drew's whereabouts, and DCF's involvement, as well as her plans to consent to the termination of her parental rights. All this said, father's June 12, 1994 letter confirms his awareness of DCF's involvement and states he knew of this as of July, 1993, when Drew was three months old. Father offered no evidence that DCF misled him or indicated they were relying on mother as a conduit for father's plans or activities. CT Page 7942
Father inferred that he was prevented from maintaining a meaningful relationship by economic circumstances. His initial home study, admitted into evidence, indicates that he had sufficient income to afford some visits and certainly to afford presents and cards, letters or phone calls. Other than father's ill-conceived Newark trip, there apparently were no other requests for assistance in funding visits.
While mother and funds created obstacles for father, he was not without resources to create and maintain a meaningful relationship with his son. Unfortunately, he did not.
 VI
The petition seeking to terminate the parental rights of David R. in and to Drew R. is hereby granted, and judgment may enter terminating father David R.'s parental rights with respect to Drew R. Pursuant to General Statutes § 17a-112(f), it is further ordered that petitioner be appointed statutory parent so that Drew R. can be placed in adoption. The statutory parent shall report to the court within ninety days on a case plan, and at least yearly thereafter until adoption is finalized.
Dated at Montville, Connecticut, this 8th day of October, 1996.
John C. Driscoll, Judge