NATURE OF PROCEEDINGS: CT Page 5595
On December 9, 1991, the Commissioner of the Department of Children and Youth Services (hereafter "DCYS") filed a petition on behalf of Eric T. seeking to terminate parental rights of his mother Margot T. The biological father of this child is unknown and was never named in these proceedings. In this petition, DCYS alleged two of the four grounds for termination: (1) that the mother had failed to rehabilitate within a reasonable period of time, considering the age and needs of the child; and (2) that the child had been denied by reason of acts of commission or omission, the care, guidance and control necessary for his physical, educational, moral or emotional well-being. Section 17a-112(b)(2)(3) of the Connecticut General Statutes. The petitioner also alleged that these conditions had existed for more than one year pursuant to this statute.
A court-ordered evaluation was performed by David Mantell, Ph.D. on February 19, 1992, and filed with the court on March 19, 1992. The trial began on April 20, 1992, and was completed on May 5, 1992. DCYS called Joan Tarsa, the social worker assigned to this case; Howard Krieger, Ph.D., a licensed clinical psychologist; Heather C. Adams, probation officer; Barbara Fleischer, clinical social worker; Patricia Dixon, foster mother; and David Mantell, Ph.D.
The respondent-mother testified on her own behalf and also called Jamie Taylor, her maternal aunt.
DCYS is required to prove one of these two grounds by clear and convincing evidence in order to prevail. Proof must be sufficient to convince the court beyond an average certainty that the respondent's rights as a parent should be terminated. In re Juvenile Appeal (84-BC), 194 Conn. 254, 255; In Re Theresa S.,196 Conn. 18, 24.
A petition for the termination of parental rights consists of two phases: the adjudicatory phase and the dispositional phase. Connecticut Practice Book, Sec. 1042, 1044, 1059. There is no requirement that the adjudicatory phase and the dispositional phase should be held in different hearings; rather, a unified hearing is permissible. In re Juvenile Appeal (84-AB), 192 Conn. 254, 259
(1984). There is a different purpose for each of the two phases. In the adjudicatory phase, the court receives evidence to determine the validity of the allegations made in the petition, and the court is limited in receiving evidence to the events that occurred prior to the filing of the petition, in this case December 9, 1991. The dispositional phase takes into account the best interest of the child, and the court is permitted to hear evidence and take into consideration facts and events to the completion of trial on May 5, 1992. CT Page 5596
BACKGROUND FACTS:
The following background facts were uncontroverted and are relevant to adjudication. Eric was born at the Danbury Hospital on August 3, 1987, and the hospital social worker reported to DCYS that he tested positive for cocaine, and that there was no electricity or baby furniture where he was to live. (State's Exhibit H.) DCYS had the electricity turned on, provided the baby furniture, and had the Danbury Visiting Nurse provide the mother with parenting services for the child.
On January 11, 1988, the mother was convicted in Danbury Superior Court for larceny in the fifth and sixth degree and sentenced to ninety days. She served three weeks at Niantic. At that time, she had left the child with Monica Hill, a friend. On January 25, 1988, while in her custody, the child sustained a spiral fracture to his right arm. Since the explanation given at the time was inconsistent with an accidental injury, DCYS obtained an order of temporary custody from this court on January 27, 1988, and the child was placed in emergency foster care. A month later, on February 29, 1988, he was placed in the foster home of Mrs. Patricia Dixon, where he has remained to the present time, or about four years and four months.
On April 25, 1988, the child was adjudicated neglected and uncared for and committed to DCYS for eighteen months, which was extended twice for the same period on October 16, 1989 and April 17, 1991.
ADJUDICATORY PHASE:
The court will consider the facts and the evidence from August, 1988, when DCYS first became involved, to December 9, 1991, the date this termination petition was filed which alleged two grounds.
I. FAILURE TO REHABILITATE:
The first ground was that the respondent-mother had "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child . . . [she] could assume a responsible position in the life of the child." Connecticut General Statutes, Sec.17a-112(b)(2).
This ground requires the court to also consider the age and needs of this particular child, and whether she has reformed her behavior and life style so that she can properly parent and meet the child's needs. What is a reasonable time and what are the needs of this child are questions of fact for the court to decide in CT Page 5597 each case. In re Rayna M., 13 Conn. App. 23 (1987), and In re Luis C., 210 Conn. 157 (1989). The statute requires the court to analyze the respondent's rehabilitation which must be achieved "within a reasonable time." In re Luis C., supra, 167.
Based on the testimony of Patricia Dixon, the foster mother; Barbara Fleischer, clinical social worker at the Waterbury Child Guidance Clinic; and Joan Tarsa, the social worker, the court finds that Eric is a special needs child. When he was fifteen months old, his foster parents enrolled him in the Waterbury Easter Seals program and his vocabulary, articulation, and speaking ability all improved. Since June, 1990, he received therapy and counseling from Barbara Fleischer. In December, 1991, he entered Head Start. He has made significant gains and except for some speech limitations, he is now a happy and healthy child.
From April 25, 1988 to March 1, 1990, DCYS and the respondent signed four treatment plans and two service agreements, all in which the goal was reunification with her child. (State's Exhibit D5 through 8.) The requirements were generally the same in all five plans. She was to remain drug free, attend counseling and parenting classes, comply with the law and cooperate with DCYS.
Instead of complying, on July 28, 1989, the respondent mother was convicted for possession of narcotics and assault II, sentenced to two years, suspended, and placed on probation for three years to January 23, 1993. Then on November 19, 1990, she was convicted for theft of credit cards. When Joan Tarsa told her that the agency would be filing a petition to terminate her parental rights, she went so far as to threaten to kill her. Her attitude with the agency was negative, adversarial and uncooperative. Because her compliance with the service agreements was sporadic, and having been convicted twice for drug possession, DCYS filed its first petition to terminate her parental rights on February 2, 1990. In the fifth treatment plan filed September 1, 1990, the goal was changed from reunification to termination. (State's Exhibit D3.) It alleged three grounds: failure to rehabilitate, acts of commission or omission, and that there was no ongoing parent-child relationship. A period of two years and eleven months have passed from the time DCYS obtained the order of temporary custody on January 27, 1988. Had the petitioner gone forward with the termination petition at that time, it may well have prevailed on the failure to rehabilitate ground. Instead, DCYS allowed the case to remain dormant on the calendar for the next thirteen months.
Then, on February 11, 1991, DCYS withdrew this first termination petition for reasons that were not given in the treatment plan or at trial, and the parties signed a third service agreement. (State's Exhibit D2.) It stated the goal now was "to clarify the CT Page 5598 steps necessary in order for Eric to be returned to the mother," which was to be accomplished by April 22, 1991. The requirements were: (1) to comply with random drug tests, remain drug free, and prove attendance at N.A. (Narcotic Anonymous) meetings: (2) stay arrest free; (3) comply with a visitation schedule which was attached to this new agreement.
According to the testimony of Heather C. Adams, the respondent's probation officer, urine samples were taken on January 29, February 11, and March 26, 1991, and all three were negative for drugs. Ms. Tarsa testified that all four urine samples taken in 1990 were also negative. The respondent testified that she had not taken any drugs during the past two years. Based on the testimony and evidence that all tests were negative, the court finds that she complied with the first condition of this service agreement. Even though she failed to provide DCYS proof of attending N.A. meetings, the best evidence that she was staying off drugs were the negative urine samples.
Ms. Adams also testified that she had been on three years probation from January 23, 1990, and ending on January 23, 1993. To the present date, she has never been violated for noncompliance. Although DCYS claims in its brief that the respondent was arrested on November 29, 1991 for larceny six and other related charges, DCYS offered no proof of a conviction for the alleged November 29, 1991 arrest. Based on Ms. Adams' testimony, the court finds that the respondent has never violated her probation, and there is no record of a conviction after the November 19, 1990 conviction for credit card theft. Therefore, she had substantially complied with the second requirement of the February 11, 1991 service agreement.
The third requirement was that she comply with a visitation schedule attached to the agreement. According to the testimony of Ms. Tarsa, the respondent visited the child at the DCYS office fourteen out of seventeen times in 1991. She was late on a number of occasions, cancelled once, and failed to attend twice. Ms. Tarsa also testified that in 1990 the respondent visited Eric eight of nine occasions, and five out of seven in 1992. Her tardiness and cancellations made it difficult on the foster parent, the agency, and it caused the child to be emotionally disturbed on those occasions. From the testimony of Ms. Tarsa, the court finds that the respondent mother substantially complied with the visitation schedule. Therefore, this third requirement was also met.
Instead of planning to return the child, or providing her with services as suggested by an administrative review of March 1, 1991, DCYS filed a second petition for termination of her parental rights on December 9, 1991. This petition alleged two grounds: failure to rehabilitate, and acts of parental commission CT Page 5599 or omission, but omitted the third ground of no ongoing parent-child relationship that had been alleged in the first petition of December 2, 1990. This second petition was filed about eight months after she had substantially complied with the February 11, 1991 service agreement. Because the court has found she complied with the agreement, the court must find facts for termination by clear and convincing evidence on one of these two grounds alleged, primarily during this nine-month period from February 11 to December 9, 1991.
There was some evidence that beginning in June, 1990, the respondent was reforming her behavior.
A letter from Pat Goldman, a group leader with the Danbury Commission on Child Care, dated June 25, 1990, confirmed that the respondent was attending a parents' group to develop a more positive life style through group therapy. (Defendant's Exhibit 2.) It stated:
 "At present, Margot is attempting to regain custody of her two-year-old son who is in foster care. This effort, often frustrating and bewildering to Margo, has sapped much of her energy and vitality.
 Margot exhibits genuine caring and pride in her three boys. Hopefully, in the coming months, her custody and housing concerns will be resolved, enabling her to `get on' with a productive life."
There was testimony from her maternal aunt, confirmed by Ms. Tarsa, that in early 1991 she had obtained adequate housing.
She is now living in a clean five-room apartment with her son, Aairon, age eight; and Marquis, age two. Ms. Taylor saw her almost daily. She became more like her mother after her biological mother died from a long-term cancer in 1987. The loss of her mother caused her to suffer a significant depression, which added to her other problems. Ms. Taylor testified that she knew Charles Tucker, a convicted drug dealer, was the father of her son, Marquis, and had been a very negative influence in her life at that time, but she has not seen him in the respondent's home for the past two years. She stated that her other two boys are always neat and appear in excellent health. In her opinion, she is a very good mother and has reformed her life. She believes the respondent could now take care of Eric in the same way she does the other boys. She also testified that the respondent had attended church regularly on Sunday for the past year. She has not been on drugs for at least two years after she broke off her relationship with Charles Tucker. CT Page 5600
The respondent testified that Charles Tucker has been out of her life for over two years and that she has lived alone with her two sons. For the past year, she has attended a bible study group on Wednesdays and church almost every Sunday. This has given her the spiritual strength to remain drug free and helped her become a stronger and better mother. There have been no referrals to DCYS or any agency as to her parenting the other two sons, Aairon and Marquis. She loves Eric equally and will be able to care for him properly as she does the other two boys. Both the respondent and Ms. Taylor were credible witnesses and their testimony is probative and compelling as to her personal rehabilitation.
To establish the failure to rehabilitate ground, DCYS introduced into evidence a psychological evaluation prepared by Dr. Mantell, and called him as a witness. He evaluated the respondent mother, the child, and the foster parents on February 19, 1992. (State's Exhibit C.) The majority of his report discusses facts taken from the nine-page social worker report prepared by Ms. Tarsa, a psychological report by Dr. Krieger, and a report of Ms. Fleischer, all in most part discussing the respondent's aberrant behavior prior to February 11, 1991. Dr. Mantell believes she is still using cocaine based on her past record and inconsistent statements, but without any clinical evidence to confirm that position. He first points out she was one and one-half hours late for his appointment and refused to be tested intellectually because she thought the case had been already decided against her. His report and testimony offered few facts and minimal reliable evidence to prove either of the two grounds from February 11 to December 9, 1991. Nevertheless, his report stated "it to be most improbable that this mother will attain a degree of personal rehabilitation to encourage the belief that she and the child could resume a significant relationship within a reasonable period of time." His report and conclusions may have had probative value in the dispositional phase, but lacked relevance in the adjudication of this petition.
He ends his seven-page report as follows: "While there is evidence of an ongoing connection between the mother and the child, it is my impression that the most significant psychological relationship is between the child and his foster parent." He concludes that it would be detrimental to the child's best interests to allow further time to re-establish a relationship between this mother and child, and that the data is consistent with termination of her parental rights, and that after being with these foster parents for over four years, the child is bonded to them.
Since Eric was placed with these foster parents when he was five months old, it hardly requires an expert opinion to reach the conclusion that he has a significant psychological relationship with them. But under our law and practice, the issue of the child's best interest can only be considered after one of the two grounds CT Page 5601 for termination has been proven by clear and convincing evidence. There must always be a two-step process, first the adjudication, and then the disposition, and the two can never be intermingled. In re Juvenile Appeal (Anonymous), 177 Conn. 648, 673, 674. The fact that a foster parent wishes to adopt and may be able to do a better job in raising the child should not be addressed until there has been strict compliance with the statutory standards for termination, and the burden of proof is always on petitioner. In re Barbara J., 215 Conn. 31, 45; In re Jessica M., 217 Conn. 459,466, 467.
As previously stated, DCYS filed the first petition to terminate her parental rights on February 2, 1990, but then withdrew it on February 11, 1991, about one year later. On this latter date, the parties signed a third service agreement which the respondent substantially performed. It is imperative that both DCYS and the respondent be held bound by this agreement. The court has the duty to enforce compliance with all such service agreements because they are the primary basis for reunification of the child and a parent. To do otherwise would erode the faith and trust of troubled parents in DCYS and our judicial process.
The petitioner must prove failure to rehabilitate or the acts of commission or omission by this respondent, primarily from facts beginning on February 11, 1991, the date DCYS changed the goal from termination to reunification, to December 9, 1991, the date that the second termination petition was filed. The delay of not going forward for one year on the first petition and the change in the goal to reunification and withdrawal of the petition on February 11, 1991, were decisions made solely by DCYS. Therefore, in equity, the agency must rely on facts and events occurring after February 11, 1991 to prove its case against this respondent.
Based on the testimony of Ms. Taylor, Ms. Adams, her probation officer, and the respondent, the court makes the following factual conclusion relative to the personal rehabilitation of the respondent:
 (1) she has been not using drugs for over one year based on the negative urine samples;
 (2) she has not been convicted of any crime since November 19, 1990;
 (3) she substantially complied with visitations permitted by DCYS during 1991 and 1992;
 (4) she has obtained suitable housing for herself and her two sons. The apartment is adequate for Eric to live there with them; and
CT Page 5602
 (5) she has taken care of her other sons properly without any charges of neglect from DCYS or any other agency or person.
After considering all the evidence, the court finds that DCYS has not sustained the burden of proof on the first ground of failure to rehabilitate by clear and convincing evidence.
As to the second ground that DCYS has alleged the child has been denied by acts of omission or commission of the respondent the care, guidance and control necessary for the child's physical educational, moral, or emotional well-being. The claims of proof on this ground are substantially the same that DCYS submitted to support the failure to rehabilitate ground. When this petition was filed on December 9, 1991, Eric had been in foster care for more than three years and nine months. He was with his mother for only five months of his entire life. DCYS did not prove by clear and convincing evidence that this child's well-being was affected by the mother's acts of omission or commission in any of the four ways listed in the statutes. In re Shannon S., 19 Conn. App. 20
(1989).
For the foregoing reasons, the petition to terminate the respondent's parental rights is dismissed.
The court orders that DCYS provide the respondent with services suggested by an independent administrative review on March 1, 1991, which were as follows: (1) family preservation; (2) a parent aide; (3) Casey Foundation for reunification; (4) a school enrichment program. (State's Exhibit D at page 5 — DCYS form 553.) These services will help determine if she can adequately care for and be reunited with her child. DCYS has the statutory duty to provide supportive services to a parent to enhance the possibility of reunification of the family. Sections 17-38a(a) and 17-43a(d) of the Connecticut General Statutes.