## STATE OF CONNECTICUT *v.* CHARLES JONES
## (13070)

PETERS, C. J., HEALEY, SHEA, GLASS and COVELLO, Js.

Argued November 4, 1987—decision released January 5, 1988

*Francis T. Mandanici,* for the appellant (defendant).

*C. Robert Satti, Jr.,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

SHEA, J. A jury found the defendant guilty of murder in violation of General Statutes § 53a-54a (a). In this appeal from the judgment rendered in accordance with the verdict, the defendant claims that the trial court erred: (1) in not excluding the testimony of the state's alibi impeachment witness where the state was late under Practice Book § 764 in disclosing his identity; (2) in failing to grant his motion for a new trial when the prejudice of the late disclosure was established at the hearing on this motion; (3) in failing to allow the defendant to present evidence explaining his flight; (4) in allowing the jury to hear, and then in failing to strike, the testimony of a witness who strongly implied that the defendant had scared away the witness's daughter from appearing in court to testify for the state; (5) in allowing the state to cross-examine two defense witnesses regarding whether they had previously told their pastor about the content of their testimony. We find no reversible error.

The jury could have reasonably found from the evidence that on July 15, 1984, the defendant shot and killed Wally Blake in a pool hall on Stratford Avenue in the city of Bridgeport. Tony Carswell testified for the state on direct examination that he saw the defendant shoot Blake in the head. Andrew Winstead testified at the trial that he did not see any shooting. The state, however, introduced his prior testimony, given at a probable cause hearing, and his prior written statement to the police, in which he indicated that the defendant had shot the victim in the head. Because this case was tried after our decision in *State* v. *Whelan,* 200 Conn. 743, 747–55, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 1598 (1986),

had been released, the jury was entitled to consider Winstead's prior inconsistent testimony and written statement for their substantive value. Officer James Cook saw the defendant's white Buick parked outside the pool hall at the time of the shooting, and noticed that the car was gone about seven minutes later. The defendant admitted he fled from the general vicinity after the shooting took place, but claimed he was 300 feet from the pool hall when the fatal shot was fired.

I

The defendant first claims that the trial court erred in not excluding the testimony of the state's alibi impeachment witness, Tony Carswell, when the state was late under Practice Book § 764 in disclosing his identity. In light of the defendant's failure to seek a continuance for the purpose of further investigation when the state disclosed Carswell's identity, we find no error in this ruling.

On April 21, 1986, the state filed a demand pursuant to Practice Book § 763 requiring the defendant to disclose whether he intended to present an alibi defense. The defendant on May 5, 1986, disclosed his alibi defense. He claimed that he had been 300 feet away from the shooting, and revealed the name and address of a defense alibi witness, Keith Jefferson. The state on June 13, 1986, filed a disclosure revealing the name of Andrew Winstead as a witness to prove the defendant's presence at the scene of the crime. Practice Book § 764. A supplemental disclosure of witnesses was made by the defendant on June 18, 1986, and July 3, 1986. The state, however, did not reveal the name of Tony Carswell as an alibi rebuttal witness until October 3, 1986, the date on which the voir dire of prospective jurors commenced.

Practice Book § 764 imposes the following requirement on the state concerning the disclosure of alibi

impeachment witnesses: "If the written demand and notice have been filed pursuant to Sec. 763, the prosecuting authority, within ten days after filing of the notice, but in no event less than ten days before the trial unless the judicial authority otherwise directs, shall file a written notice stating the names and addresses of the witnesses upon whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied upon to rebut testimony of any of the defendant's alibi witnesses."

The state contends that Practice Book § 764 did not require it to disclose the identity of Carswell until October 3, 1986, when jury selection for the trial began. The Bridgeport police on July 24, 1984, took a written statement from Carswell in which he claimed that he had seen the defendant shoot the victim in the head. The state argues that it was not required to disclose Carswell's name because he had indicated to both the state and the defense that he would not testify. The state contends that it is only obliged to disclose the identity of alibi impeachment witneses who *will* testify, not those who *may* testify. The state also maintains that it was only after this court had released its decision in *State* v. *Whelan,* supra, on August 5, 1986, that it became possible for the state to use Carswell's statement to the police made on July 24, 1984, as substantive evidence, if he should deny on the witness stand that he had seen the defendant shoot the victim. Even if this court were to accept the state's arguments concerning the impact of *State* v. *Whelan,* supra, on the case at bar, the state should have disclosed Carswell's identity within ten days of the release of that decision.

Our interpretation of Practice Book § 764 is that the state must disclose the identity of an alibi impeachment witness when that witness has given a written statement to the police in which he asserts that he has seen

the defendant commit the crime charged even though the state is uncertain whether it will call him to testify. We need not decide under what other circumstances the state may be required by Practice Book § 764 to disclose the identity of an alibi impeachment witness where the state is not sure whether it will call that witness. We note, however, that the requirements of Practice Book § 764 cannot depend on the subjective intentions of the state regarding whether it may call a particular alibi impeachment witness. Even in the absence of a written statement from such a witness the state would be well advised in the future to disclose his identity promptly if there is a reasonable possibility that the state may call him to testify at trial.

While we hold that the state should have disclosed the identity of Carswell before the jury voir dire commenced, we conclude that the trial court did not abuse its discretion in permitting him to testify at the trial. See *State* v. *Boucino,* 199 Conn. 207, 214–16, 506 A.2d 125 (1986). The trial court permitted defense counsel to interview Carswell the weekend before he testified. The defendant was able to impeach Carswell's credibility by disclosing that he had twelve convictions. If the defendant believed that the state's late disclosure of its alibi impeachment witness was prejudicial, he should have requested a continuance. The defendant never made such a request. In fact, when the issue of Carswell's late disclosure was discussed during the trial, defense counsel stated: "[A]ny further delay would be substantially prejudicial to us." The defendant contends that he was not required to seek a continuance because his motion for a speedy trial had been granted on October 1, 1986, but we can find no authority to support this novel proposition. In this case the state's late disclosure was not of constitutional significance. The proper remedy under the circumstances would have been a continuance. "If the defendant felt

that he had insufficient time to prepare, his remedy would have been to request a continuance, which he did not do." *State* v. *Villafane,* 171 Conn. 644, 669, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977), overruled in part on other grounds, *State* v. *Stepney,* 191 Conn. 233, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984).

## II

The defendant next claims that the trial court erred in failing to grant his motion for a new trial when the prejudice of the late disclosure was established at the hearing on the motion.

The jury found the defendant guilty of murder on October 21, 1986. The defendant filed a motion for a new trial under Practice Book § 902 on October 24, 1986. This motion again raised the issue of the trial court's failure to exclude Carswell's testimony because of the state's late disclosure of his identity.[1] On November 21, 1986, the defendant filed an addendum to his motion for a new trial in which he set forth allegedly newly discovered evidence in the form of a signed affidavit of Judy Grant. The trial court held a hearing regarding this motion on November 25, 1986.

Because we have determined that the trial court did not abuse its discretion in allowing Carswell to testify despite the state's late disclosure, we need not further consider that aspect of this claim. The defendant at the November 25, 1986 hearing sought to introduce the testimony of Grant concerning her affidavit submitted

[1] The defendant in his motion for a new trial under Practice Book § 902 also claimed that the trial court erred in allowing Clara Bullock to testify concerning her daughter's failure to appear at the trial. We examine that claim later in this opinion, and conclude that the trial court's error in permitting this testimony was harmless in nature. Such a harmless error would not justify a new trial under Practice Book § 902.

to the trial court as part of the defendant's addendum motion on November 21, 1986, that she was with Carswell at the time of the shooting, and that he was not near the pool hall. The state objected to allowing Grant to testify about the events of July 15, 1984, and argued that under a Practice Book § 902 motion the defendant could inquire only why she had not testified at the trial during October, 1986. The trial court sustained the state's objection. We conclude that the trial court properly limited the scope of Grant's testimony.

There is a significant difference between Practice Book §§ 902-903 and 904. Practice Book § 902 is concerned with motions for a new trial based on errors committed during the trial. Section 903 requires that a § 902 "motion for a new trial be made within five days after a verdict or finding of guilty . . . ." On the other hand, § 904 provides: "A request for a new trial on the ground of newly discovered evidence shall be called a petition for a new trial and shall be brought in accordance with Gen. Stat., § 52-270." A party has three years to bring a petition for a new trial. General Statutes § 52-582.

We have distinguished between a petition and a motion for a new trial in regard to their appealability as final judgments. *State* v. *Asherman,* 180 Conn. 141, 143, 429 A.2d 810 (1980). Moreover, a different standard of review applies in these two separate procedures for seeking a new trial. To obtain a new trial through a § 904 petition, a defendant must overcome a "strict standard" including a requirement that the newly discovered evidence be "likely to produce a different result in a new trial." *Asherman* v. *State,* 202 Conn. 429, 434, 521 A.2d 578 (1987). The standards for determining whether a trial error should result in a new trial under Practice Book § 902 are as follows: "Upon motion of the defendant, the judicial authority may grant him a new trial if it is required in the interests of justice.

Unless the defendant's noncompliance with these rules or with other requirements of law bars his asserting the error, the judicial authority shall grant the motion: (1) For an error by reason of which the defendant is constitutionally entitled to a new trial; or (2) For any other error which the defendant can establish was materially injurious to him." The defendant concedes that there are substantial differences between Practice Book §§ 902 and 904.

The trial court did not err when it refused to allow Grant to testify concerning the events of July 15, 1984. A motion for a new trial under Practice Book § 902 is limited to trial errors, and cannot be based upon newly discovered evidence. The trial court during the trial was not even aware of Grant's existence, so it could not have erred regarding any testimony she might have given about the crime. The defendant must bring a petition under § 904 if he wishes to seek a new trial based on newly discovered evidence.

### III

The defendant claims that the trial court erred in failing to allow him to present evidence explaining his flight from the scene of the crime and subsequent absence from his residence. We agree that the ruling was incorrect, but conclude that this error was harmless in nature.

After an objection from the state on hearsay grounds, the trial court prevented the defendant's sister, Alisa Brooks, from testifying regarding alleged threats by the victim's family against the defendant. She sought to testify that she had relayed these threats to the defendant. Later, after another objection by the state on hearsay grounds, the trial court prevented the defendant from testifying as to what others had told him regarding such threats.

The trial court should have overruled the state's objections to questions concerning the threats made by others to the defendant, either directly or through his sister, Alisa Brooks. The defendant did not offer this testimony for the truthfulness of the threats, but for its effect on the defendant's state of mind regarding flight. Out-of-court statements to a person are admissible to show his state of mind where his mental state is relevant. *State* v. *Brokaw*, 183 Conn. 29, 32, 438 A.2d 815 (1981); *Zenik* v. *O'Brien*, 137 Conn. 592, 598, 79 A.2d 769 (1951). A person's "state of mind" can be shown "from what he heard as well as from what he saw, even though what he heard would be normally classified as hearsay. . . . The evidence [concerning a third party's statement to the witness] was admissible not to establish the truth of the facts asserted but to show what was in the defendant's mind in testing the reasonableness of his belief . . . . " (Citations omitted.) *Zenik* v. *O'Brien,* supra, 598.

The defendant argues that the trial court's error in restricting the defendant's evidence explaining his flight deprived him of his due process right to present a defense. He argues that the burden is on the state to prove that this error was harmless beyond a reasonable doubt. *Chapman* v. *California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967). Despite these claims, we conclude that the trial court's error in this regard was not of constitutional magnitude.

Whether a trial court's erroneous restriction of a defendant's or defense witness's testimony in a criminal trial deprives a defendant of his due process right to present a defense is a question that must be resolved on a case by case basis. See *State* v. *Bryant*, 202 Conn. 676, 704, 523 A.2d 451 (1987). In the case at bar, the defendant was able to introduce evidence supporting his contention that his flight was the result of his fear

of the victim's family. The defendant testified, "[Blake's mother, brother, and cousins were] out there talking about what they [were] going to do to me if I showed up." The defense counsel asked the defendant, "Are you telling us there was a reason why you were afraid to go home?" The defendant replied "yes" to that question. The defendant then testified as follows, "I couldn't go home . . . [b]ecause people [were] laying on the front waiting for me." Despite the trial court's erroneous ruling concerning the flight testimony, the defendant was able to present his explanation that fear motivated his flight. Under the circumstances of this case, the trial court did not deprive the defendant of his due process right to present a defense.

When a trial error in a criminal case does not involve a constitutional violation the burden is on the defendant to demonstrate the harmfulness of the court's error. *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980). The defendant must show that it is more probable than not that the erroneous action of the court affected the result. Id.; *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976). In view of the defendant's testimony that his fear of the victim's family motivated his flight, it cannot be said that this error probably affected the result of the trial.

## IV

The defendant also claims that the trial court erred in allowing the jury to hear, and then in failing to strike, testimony that may have implied that the defendant had intimidated a potential witness from appearing in court to testify for the state. We agree that the ruling was erroneous but conclude that the error was harmless.

Clara Bullock testified for the state before the jury that her daughter, Regina Bullock, had two children by the defendant. After the witness testified that she had

seen her daughter the previous evening, the defendant objected to the questions concerning Regina Bullock on the ground that they were irrelevant because the daughter had never been mentioned as a witness. The state made an offer that this line of questioning was relevant to rebut a missing witness argument or instruction that might later be made or requested by the defendant. *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960). The defendant also asserted that this kind of testimony ought to be heard outside the presence of the jury. The trial court overruled the defendant's objections, and noted an exception. Clara Bullock testified that a policeman had left a subpoena for her daughter. She then testified, "Regina was scared to come down here. . . . She's scared to come down here to appear in court." The trial court then sua sponte stopped her from elaborating on the fact that her daughter was scared. The defendant did not object further at this time, but, shortly after the conclusion of Clara Bullock's testimony, he moved to have her entire testimony stricken, and to have the trial court admonish the jury not to consider it. The trial court ruled that her testimony was relevant to the missing witness issue, and denied this motion. An exception was properly taken.

We agree with the defendant that the evidence concerning the missing witness issue should have been heard initially outside the presence of the jury. We have held that any party intending to argue to the jury that an unfavorable inference should be drawn from the absence of a particular witness must seek advance permission from the trial court. *State* v. *Williams,* 195 Conn. 1, 14, 485 A.2d 570 (1985); *State* v. *Daniels,* 180 Conn. 101, 113, 429 A.2d 813 (1980). The purpose of requiring such a ruling in advance is to prevent a jury from hearing prejudicial matters that may later be excluded by the court's ruling. It follows that evidence

pertaining to a missing witness, not otherwise relevant, should also be presented in the absence of the jury. The denial by the trial court of the defendant's request to excuse the jury while the admissibility of the evidence concerning Regina Bullock was under consideration, therefore, was erroneous.

Because the trial court ultimately found admissible Clara Bullock's testimony that her daughter was "scared to come down here to appear in court," it is of no consequence in this case that the jury heard the testimony before the ruling was made. The propriety of the ruling, however, remains for our consideration. The state has not advanced any reasonable basis to support its contention that the jury might have drawn an adverse inference from its failure to produce Regina Bullock as a witness unless this evidence of her unavailability had been allowed. As the defendant's girlfriend and mother of his children, she was hardly "one whom [the state] would naturally be expected to produce." *State v. Daniels,* supra, 108. "A witness who would naturally be produced by a party is one who is known to that party and who, by reasons of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce." *Secondino v. New Haven Gas Co.,* supra. At the time of the ruling there had been no showing that Regina Bullock had any knowledge related to the crime. If the defendant's objection to the evidence of her unavailability had been sustained, he could not later have argued or requested a charge that an unfavorable inference should be drawn from the state's failure to produce her as a witness. It is possible, of course, that a jury may draw such an inference on its own without the benefit of argument or instruction, but the circumstances of this case make that possibility extremely remote. We conclude that the trial court erred in overruling the defendant's objection to this testimony.

We have recently held that an erroneous missing witness charge at a criminal trial "engenders a claim arising under state law and does not involve any constitutional right" and that, accordingly, "the defendant bears the burden of proving harmful error." *State* v. *Shashaty,* 205 Conn. 39, 44, 529 A.2d 1308 (1987). "[T]he defendant must show that the charge was likely to have affected the verdict." Id. We deem the same standard appropriate in assessing the harmfulness of the trial court's error in admitting the testimony concerning Regina Bullock's unwillingness to testify. The thrust of the defendant's argument is that the testimony that "she's scared to come down here to appear in court" might have indicated to the jury that the defendant had threatened her in order to keep her from testifying. This possibility, however, was not mentioned at the time the defendant raised his objection. The trial court may well have assumed that the word "scared" suggested no more than the understandable reluctance of many people to appear in court, especially when the trial involves someone close to them. It is not claimed that the state during argument before the jury contended that the defendant had "scared" this witness from testifying. No charge concerning the conduct of the defendant toward Regina Bullock as evidence "inconsistent with innocence" was requested or given. See *State* v. *Holliday,* 159 Conn. 169, 173, 268 A.2d 368 (1970).

The defendant has attempted to buttress his claim of harmfulness by referring to testimony much later in the trial concerning Regina Bullock. During the defendant's presentation of evidence the state cross-examined his sister, Alisa Brooks, as to whether the defendant had told her that he had spoken to Regina after the crime had occurred and had admitted that he had shot the victim. Brooks denied that any such conversation had taken place. No objection was raised to

this examination. When the defendant testified, the state also asked him whether he had spoken with Regina about the shooting and had told her of his involvement in the crime. The defendant did object to this question without stating his ground, but failed to except to the overruling of his objection as required by Practice Book § 288 in order to preserve the ruling for appeal. At no point during the trial did the defendant claim, as he does on appeal, that the potential harmfulness of the testimony that Regina Bullock was "scared to come down here to appear in court" had been accentuated by the state's cross-examination concerning a possible conversation between her and the defendant. Since both the defendant and his sister denied knowledge of any such conversation, it would be highly speculative to assume that the jury somehow inferred from the use of the word "scared" by Clara Bullock that the defendant had intimidated Regina Bullock in order to keep her from testifying. We conclude that the defendant has not adequately demonstrated that the erroneous failure to exclude the testimony of Clara Bullock was sufficiently harmful to have affected the outcome of the trial.

## V

The defendant's final claim is that the trial court erred in allowing the state to cross-examine defense witnesses regarding whether they had previously told their "pastor" about the content of their testimony. Although the defendant at trial objected only upon the ground of relevance, he now claims that these questions deprived him of his rights to due process, to a fair trial, to freedom of religion, and to equal protection of the laws. We disagree with these claims because the state's questions may reasonably be construed as designed to elicit whether these witnesses had reported their alibi evidence to a person in a position of author-

ity before the trial rather than to discredit these witnesses by calling attention to their religious affiliations or lack thereof.

The state's attorney asked Brenda Dunham whether she had gone to the police with her purported alibi evidence. She replied in the negative. Then the state's attorney asked her, "Did you ever tell your church clergyman, pastor, or minister . . . [d]id you ever talk to your church?" After the defendant's objection had been overruled, she answered, "I haven't been to church." Later, the state's attorney asked Keith Jefferson whether he had ever gone to the police to tell them that the defendant was innocent. He replied: "No." The next question was: "Did you ever go to any member of your church such as [a] pastor or clergyman?" Jefferson responded: "No, never did."

The state's attorney was seeking to explore whether these two witnesses had ever told any person in authority about their purported alibi evidence when he questioned them concerning whether they had reported this information to a pastor. After the state's attorney had questioned Dunham about communicating with her pastor, he then asked her: "Did you ever talk to any official at all . . . to let them know an innocent man was being charged with a crime, ma'am?" She answered: "No, I tried to find his sister." After questioning Keith Jefferson about whether he had ever talked with his pastor about the defendant's innocence, the state's attorney went on to ask whether Jefferson had ever discussed this alibi evidence with "any alderman," "any fireman," or "any type of authority."

In *State* v. *Ghere*, 201 Conn. 289, 303–304, 513 A.2d 1226 (1986), this court upheld a ruling permitting, over an objection on the ground of relevancy similar to that raised in this case, cross-examination of alibi witnesses as to whether they had informed the police that at

the time the crime had occurred they had seen the defendant at a location far from the scene of the crime. "Although we do not believe that an alibi witness has a duty to report an alibi story to the police or, for that matter, to any other person, a witness in many instances naturally may be expected to convey such information, especially when the witness is friendly with the accused. Failure of the witness to do so would, under these circumstances, constitute grounds for impeachment." Id., 304. In *State* v. *Mullings,* 202 Conn. 1, 14–15, 519 A.2d 58 (1987), we rejected a claim that such cross-examination implicates a fundamental constitutional right, such as the right to due process, a fair trial, or an opportunity to present a defense. "We have never recognized any fundamental right of a defendant not to have his witnesses discredited." Id., 15. In *State* v. *Bryant,* 202 Conn. 676, 704, 523 A.2d 451 (1987), we recognized that the due process right to present a defense included the right to present alibi witnesses. We noted, however, that "there are few, if any, per se prohibitions on questioning such a witness." Id. For the purpose of a retrial of the case ordered on other grounds, we advised of the necessity of establishing a proper foundation for this kind of cross-examination.

Our previous decisions would be clearly dispositive of the defendant's claim of improper cross-examination were it not for the references to church officials in the state's questions mentioning various persons regarded as having some authority in the community to whom a witness, aware of a criminal prosecution against an acquaintance, might naturally have disclosed information supporting his innocence. These references make it necessary for us to review the claim to determine whether any fundamental constitutional right of the defendant has been infringed. *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

It is conceivable that the first amendment right of a witness not to affiliate with any religion may be implicated where his lack of such an affiliation with a church is publicly exposed by the interrogation of a public official in a situation where such a church relationship is wholly irrelevant to any proper subject of governmental inquiry. The state in this case makes no claim that the religious affiliation of any alibi witness was even remotely pertinent to any issue at trial. In this appeal, however, we are not dealing with the constitutional rights of the witnesses who were subjected to such improper questions, but with those of the defendant. The transcript discloses no allusion to his religious affiliation or lack thereof. He, of course, cannot rely upon a possible violation of the constitutional rights of his defense witnesses, unless there has been some impact upon his own constitutional right of fair trial. See *Rakas* v. *Illinois,* 439 U.S. 128, 133–34, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1979).

In assessing the effect of the questions at trial referring to religious affiliation or lack thereof, we are convinced that they had no more bearing on the outcome than the inquiries with which they were interspersed concerning the failure of the witnesses to disclose their information to the "police," "any alderman," "any fireman," "any type of authority," or "any official at all." The absence of any objection by defense counsel on constitutional grounds indicates that he did not view the references to church officials as tending to degrade the defense witnesses for failure to attend church or to be more intimate with church personnel. The jury could only have viewed the references to church officials in the same light as those made to various public officials as persons to whom one might disclose evidence of innocence. In these times it is highly improbable that the lack of a religious affiliation on the part

of a witness would have any significant impact on his credibilty as perceived by a jury. Thus we conclude that the defendant sustained no prejudice constituting a violation of a fundamental constitutional right from the erroneous overruling of his objection that it was irrelevant whether a witness had spoken with her "church clergyman."[2] See *Commonwealth* v. *Bond,* 17 Mass. App. 396, 400–401, 458 N.E.2d 1198, cert. denied, 391 Mass. 1103, 461 N.E.2d 1219 (1984); *Commonwealth* v. *Rawls,* 276 Pa. Super. 89, 101–102, 419 A.2d 109 (1980), appeal dismissed, 499 Pa. 267, 452 A.2d 1347 (1982).

We remind the state, however, that it must exercise caution when exploring lines of questioning that implicate religious belief. The state should avoid any inquiry into or reference to religious belief or practices unless the nature of the case makes religious belief an unavoidable issue. See *State* v. *Thomas,* 130 Ariz. 432, 636 P.2d 1214 (1981).

There is no error.

In this opinion the other justices concurred.

---

[2] The defendant's objection was as follows:

"Q. Did you ever tell your church clergyman, pastor, or minister—

"Mr. Ganim: Objection, your Honor. I don't know what relevancy that is if she spoke to her church clergyman. That would be privileged information anyway.

"The Court: Overruled.

"Mr. Ganim: Exception, please, your Honor."

The defendant has not briefed the portion of his objection concerning "privileged information," and is therefore deemed to have abandoned any claim of error based upon that part of his objection. *Fleischer* v. *Kregelstein,* 150 Conn. 158, 159, 187 A.2d 241 (1962); see General Statutes § 52-146b.