STATE OF CONNECTICUT *v.* WILLIAM C.[1]
(SC 16864)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

---

[1] In accordance with General Statutes § 54-86e, as amended by Public Acts 2003, No. 03-202, § 15, and the court policy of protecting the privacy of victims in sexual abuse matters, we decline to use the names of individuals involved in this appeal.

Argued November 26, 2003—officially released March 9, 2004

*Hubert J. Santos*, with whom were *Hope C. Seeley* and *Patrick S. Bristol*, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *Christopher L. Morano*, chief state's attorney, and *Sandra L. Tullius*, assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The principal issue in this certified appeal is whether the Appellate Court, in affirming the

defendant's judgment of conviction of one count of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A),[2] and one count of risk of injury to a child in violation of General Statutes (Rev. to 1995) § 53-21, as amended by Public Acts 1995, No. 95-142, § 1,[3] properly determined that certain department of children and families (department) records regarding the victim were admissible pursuant to the business records exception to the hearsay rule, but that the trial court's exclusion of such records was a harmless impropriety. The defendant claims that the Appellate Court improperly concluded that the evidentiary exclusion was harmless because the department records were cumulative of other evidence presented by the defendant with regard to the credibility of the victim's testimony. We conclude that: (1) the department records satisfy the statutory criteria for admission pursuant to the business records exception to the hearsay rule, as set forth in General Statutes § 52-180;[4] and (2) the trial court's exclusion of such records was harmful to the defendant. Accordingly, we reverse the judgment of the Appellate Court.

---

[2] General Statutes § 53a-73a (a) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when: (1) Such person intentionally subjects another person to sexual contact who is (A) under fifteen years of age . . . ."

[3] General Statutes (Rev. to 1995) § 53-21, as amended by Public Acts 1995, No. 95-142, § 1, provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony."

[4] General Statutes § 52-180 (a) provides: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter."

The defendant was charged with one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2),[5] one count of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A),[6] two counts of sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A), and two counts of risk of injury to a child in violation of § 53-21. After a jury trial, the defendant was convicted of one count of fourth degree sexual assault[7] and one count of risk of injury to a child,[8] and was acquitted of the remaining four counts of the amended information. Thereafter, the trial court sentenced the defendant to a total of ten years imprisonment, execution suspended after six years, and five years probation. The defendant then appealed to the Appellate Court, which affirmed the judgment of conviction. *State* v. *William C.*, 71 Conn. App. 47, 50, 801 A.2d 823 (2002). We thereafter granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly conclude that the defendant was not

[5] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

[6] General Statutes § 53a-72a (a) provides in relevant part: "A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact (A) by the use of force against such other person or a third person . . . ."

[7] The sexual assault in the fourth degree count of the amended information alleged that the defendant "did touch [the victim's] breasts with his hands while applying sunburn lotion and/or lotion for a rash for the purpose of said defendant's sexual gratification and/or for the purpose of degrading and/or humiliating such [victim] when said [victim] was less than fifteen years of age . . . ."

[8] The risk of injury to a child count of the amended information alleged that the defendant "did wilfully and/or unlawfully cause a child under the age of sixteen years to be placed in such a situation that her health is likely to be injured and/or her morals are likely to be impaired and/or did perform an act or acts, to wit: have sexual contact with the breasts of a female child . . . ."

harmed by the trial court's exclusion of the [department's] records?" *State* v. *William C.*, 262 Conn. 907, 810 A.2d 277 (2002). Subsequently, pursuant to Practice Book § 84-11,[9] the state presented for review the following alternate ground on which to affirm the judgment of the Appellate Court: "Whether the Appellate Court erred in concluding that the excluded [department] records are business records?"[10]

The jury reasonably could have found the following relevant facts, as set forth in the opinion of the Appellate Court. "When the victim was quite young, the [department] removed her from the home of her biological parents. She lived with her maternal grandmother for a period of time before the defendant and his wife began to care for her. The defendant and his wife [parents] subsequently adopted the victim when she was about seven years old. In the fall of 1995, the victim began to communicate with her biological mother, who is the sister of the defendant's wife. The victim did not get along well with her adoptive mother and expressed a desire to live with her biological mother. She thought this would be possible if she were removed from her parents' home.

"The victim developed behavioral problems that intensified when she was in the seventh grade. In partic-

---

[9] Practice Book § 84-11 (a) provides in relevant part: "Upon the granting of certification, the appellee may present for review alternative grounds upon which the judgment may be affirmed provided those grounds were raised and briefed in the appellate court. . . ."

[10] Although the question certified for our review is focused upon whether the trial court's exclusion of the records was harmless, we recognize that whether the department's records qualify as business records for the purposes of the hearsay exception codified in § 52-180, and therefore possess a degree of evidentiary reliability, appropriately factors into our analysis as to whether the exclusion of the records was harmful. Additionally, both · parties have briefed and argued the state's alternate ground for affirmance and neither side would be prejudiced by our review of the issue. Consequently, we view the state's alternate ground for affirmance as inextricably intertwined with the certified issue and elect to review it.

ular, the victim had difficulty coping with her anger and with limits imposed on her, and she had difficulty telling the truth. She sometimes destroyed personal property belonging to others. On one occasion, she 'trashed' her parents' home and lied to a neighbor to obtain transportation to another part of town. She had difficulties with her classmates and refused to go to school. During the 1996 spring semester, her parents enrolled her in a special school in which she was able to receive psychological counseling in addition to academic instruction. In February, 1996, the victim became angry with her mother for not permitting her to have a party and assaulted her mother. The victim threatened suicide and, for a brief period of time, received inpatient treatment at the child and adolescent psychology department of Mount Sinai Hospital . . . . The special school provided the victim and her parents with family therapy [through] a clinical psychologist assigned to the victim. As part of the family therapy, the victim and her parents entered into a behavioral contract. Because the victim and her mother argued a great deal, the family agreed that the defendant should deal with the victim if she failed to comply with the behavioral contract.

"In March, 1996, the victim told her peers at her new school that the defendant had sexually abused her. According to the victim's psychologist, who learned of the reported abuse second hand, the victim first complained about the defendant's behavior when she was asked to confront her inappropriate behavior toward her peers. The psychologist held a family conference to discuss what she understood to be inappropriate boundaries in the family home, e.g., the defendant's touching himself and 'mooning' the victim. During the conference, the victim alleged that the defendant had inserted his finger into her vagina. The psychologist then made a sexual abuse report to the department and

to the police." *State* v. *William C.*, supra, 71 Conn.
App. 51–53.

The defendant was thereafter convicted of two of the
six counts alleged in the amended information: one
count of fourth degree sexual assault and one count of
risk of injury to a child. "With respect to the charges
of which the defendant was convicted, the victim, who
was then fifteen years old, testified that the defendant
had fondled her breasts when he applied lotion to her
sunburned back and again when he applied lotion to a
rash on her torso. When he testified, the defendant
admitted that on different occasions he had applied
lotion to sunburn on the victim's back and to a rash on
the victim's torso, including her chest and the sides of
her breasts, but he denied that he had touched her
nipples or touched the victim in a sexual manner. The
theory of defense to the victim's allegations was that
the victim had fabricated the allegations of sexual abuse
so that she could move out of her parents' home and
live with her biological mother." Id., 53.

On appeal to the Appellate Court, the defendant
claimed that the trial court improperly had excluded
from evidence certain records maintained by the depart-
ment regarding the victim's veracity, her pattern of mis-
behavior following the disclosure of abuse and the
legitimacy of the victim's accusations against the defen-
dant.[11] Id., 74. The Appellate Court agreed with the

[11] In addition to the certified issue that we address in this opinion, the
defendant also raised, in the Appellate Court, the following claims: (1) that
the state and the trial court had failed to disclose material exculpatory to
the defendant; *State* v. *William C.*, supra, 71 Conn. App. 54; (2) that the trial
court improperly had excluded from evidence portions of a diary narrative
allegedly written by the victim; id., 66–67; (3) that the trial court improperly
had admitted hearsay evidence presented by several of the state's witnesses;
id., 67–68; and (4) that the trial court improperly had charged the jury by
failing (a) to instruct that there must be unanimity amongst the jurors as
to the factual predicate for the jury's verdict; (b) to define what constitutes
"sexual contact" for the purposes of a charge of sexual assault in the fourth
degree; and (c) properly to instruct the jury regarding reasonable doubt and
the presumption of innocence applicable in criminal trials. Id., 75. The

defendant that the department's records were admissible pursuant to § 52-180, and that the trial court improperly had excluded the records from evidence. Id., 74–75. Nevertheless, the Appellate Court concluded that the trial court's abuse of its evidentiary discretion was harmless error. Id., 75. In particular, the Appellate Court determined that it had reviewed the records in camera and that "[t]he [records] reveal that the victim's behavior had not changed since she was placed in foster care. She continued to lie and to misbehave. The victim's lying and misbehavior were the subject of much testimony, and putting the department's records into evidence would have been cumulative. The jury was well aware of the victim's penchant for failing to tell the truth when it suited her objectives." Id. This certified appeal followed.

Before this court, the defendant claims that the Appellate Court properly concluded that the records of the department were admissible pursuant to the business records exception, but improperly determined that the trial court's abuse of discretion in excluding the records was harmless. More specifically, the defendant asserts that the records of the department were critical to the defense theory at trial that the victim had concocted the allegations of abuse against the defendant. In particular, the defendant points to certain entries made by department workers that: relate to the victim's problems with veracity following her placement into foster care; indicate the victim herself had questioned whether the defendant actually had abused her or whether she had "dreamed" up the abuse; and the victim had conveyed her doubts as to the legitimacy of her accusations to various other individuals. The defendant, relying upon the various factors that we have articulated as relevant in the inquiry as to whether an evidentiary

Appellate Court rejected each of these claims made by the defendant; id., 54, 67, 68, 75; and the issues are not before us in this appeal.

impropriety is harmless,[12] further claims that: (1) the records were crucial evidence in that they impacted the credibility of the state's key witness at trial, the victim; (2) the records were not, as the Appellate Court concluded, cumulative of other evidence used to impeach the credibility of the victim because the department's records did not, as the other impeachment evidence did, focus upon the victim's credibility in general or in other unrelated instances, but rather specifically regarded the victim's veracity as to the charges of abuse against the defendant and the legitimacy of those allegations; (3) the trial court's exclusion of the records was harmful because, although the defendant did cross-examine the victim with regard to her credibility in general, the department's records were the only evidence through which the defendant could contradict the victim's trial testimony that the incidents of abuse actually had taken place; and (4) the state's case against the defendant was not particularly strong, emphasizing the critical nature of the victim's testimony and the harm visited upon the defendant by the trial court's exclusion of the records.

In response, the state raises, as an alternate ground on which to affirm the judgment of the Appellate Court, the claim that the records were not admissible pursuant to the business records exception to the hearsay rule because the records contain statements made by individuals without a business duty to make reports regarding the victim and contain statements of opinion made by individuals whose qualifications to render opinions

---

[12] "Whether . . . error [in connection with the exclusion of evidence at trial] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Internal quotation marks omitted.) *State* v. *Casanova*, 255 Conn. 581, 595, 767 A.2d 1189 (2001).

regarding the victim have not been established. In sum, the state concedes that the records were made by the department in the regular course of its business, but contends that not everything found in the files of a business is admissible pursuant to the business records exception; rather, to the extent such files contain hearsay evidence or information transmitted by individuals without a business duty to report, such records independently must be determined to be admissible under our well settled principles of evidentiary admissibility. As to the certified issue, the state contends that the Appellate Court properly concluded that the trial court's exclusion of the records did not prejudice the defendant because the records were merely cumulative of other evidence adduced by the defendant as to the veracity of the victim. Furthermore, the state claims that the exclusion of the records was harmless because, in light of the defendant's testimony that he had rubbed lotion on the victim in order to treat a sunburn and a rash, but denied doing so for sexual gratification, the verdict of the jury likely turned upon the jury's critical assessment of the *defendant's* credibility. As such, the state contends that the exclusion of the records, evidence that was relevant to an assessment of the victim's credibility but irrelevant as to the defendant's credibility, was harmless. We agree with the defendant that the trial court abused its discretion by excluding the department's records in their entirety, and we further conclude that the evidentiary impropriety was harmful to the defendant.

The following additional facts guide our resolution of these issues. At trial, the victim testified as to two instances in which she claimed that the defendant inappropriately had touched her breasts.[13] As to the first,

---

[13] As the count of sexual assault in the fourth degree of which the defendant was convicted; see footnote 2 of this opinion; contains both of these allegations; see footnote 7 of this opinion; it is unclear from this record as to whether the jury convicted the defendant on the basis of both, or just

the victim testified that, while rubbing lotion on her back in order to treat a sunburn, the defendant had moved both of his hands to the front of the victim's body and had fondled her breasts for approximately ten minutes. With regard to the second incident of abuse, the victim testified that the defendant had noticed the victim scratching a rash that had developed on her upper chest because the victim had used too much detergent when washing her clothes. The defendant asked the victim to lift her shirt in order to see the rash and then told her to retrieve lotion from an upstairs bathroom. The victim testified that the defendant thereafter applied the lotion to her chest area and, despite the fact that the rash had not spread to her breast area, then proceeded to fondle her breasts for approximately five minutes.

The victim subsequently was subjected to cross-examination by the defendant over the course of three days. During this lengthy cross-examination, defense counsel questioned the victim as to her veracity, the inconsistent statements she had made to various individuals regarding the allegations of abuse, and her recollections of the details of the abuse.[14] On redirect

one, of these incidents. Consequently, we set forth relevant facts as to each allegation.

[14] Specifically, the defendant elicited from the victim that: (1) there was a temporal gap of significant duration from the cessation of the defendant's acts of abuse until the victim's initial disclosure of the abuse; (2) the victim owned a book on the subject of sexual abuse prior to her initial disclosure; (3) on a previous occasion the victim had constructed an elaborate lie to a neighbor in order to get a ride across town; (4) the victim had not disclosed her allegations of abuse to her physician or therapist during a hospitalization occurring prior to her initial disclosure; (5) following her disclosure of abuse, the victim had told a foster parent that she was going to say that the sexual abuse never took place in order that the victim could return home; (6) the victim had told a foster parent that perhaps she had dreamed up the sexual abuse but had made no such statement to any other individual; (7) a statement that the victim had signed for law enforcement detailing her allegations contained several inconsistencies with her trial testimony; (8) the victim had lied to a classmate about the abuse in order to avoid talking to the classmate about the abuse; (9) the victim had allowed a friend

examination, the state attempted to rehabilitate the victim's testimony by eliciting that the victim would often deny that the abuse had taken place or lie regarding the abuse in order to avoid talking about its details; that the victim had not read thoroughly the statement provided to law enforcement regarding the abuse; and that the victim had lied to her friend who had read her diary because she did not want to get into trouble. In summary, the gravamen of the victim's testimony was that the abuse indeed had taken place as described in her trial testimony and that prior statements to the contrary had been made only to avoid having to discuss the abuse or in an attempt to return home.

Thereafter, during the defendant's case-in-chief, Denise D'Auteuil, a social worker with the department, was called as a witness. During her testimony, D'Auteuil indicated that she was the social worker assigned to oversee the victim's placement in foster care, which had begun after the initial disclosure of abuse and the victim's subsequent removal from the defendant's home. D'Auteuil further testified that it was the policy and practice of the department, in instances in which a child would be involved in long-term supervision by the department, for the various department workers involved in the case to maintain a file on the matter. Included in this file would be a running narrative in which each worker involved in the case would create an entry as to their various activities with regard to

to read a portion of her diary detailing the allegations of abuse and had told the friend that she had made up the story so that the defendant's wife would read the diary and become angry with the defendant; (10) the victim lied to her parents "[w]henever I needed to get myself out of trouble" or to avoid the consequences of her actions; (11) the victim had told certain individuals that the allegations were untrue because she wanted to avoid talking about the abuse; (12) the victim had questioned, for a time, whether what the defendant was doing was sexual abuse and had consulted her sexual abuse book; and (13) the victim lied in correspondence to her grandmother asking for money to replace items stolen from the victim.

the child and the progress of the child based upon communications by individuals involved in the child's life, including the child's foster parents.

Pursuant to § 52-180, the defendant then attempted to question D'Auteuil about a portion of the department's records containing certain statements made by the victim's foster parents concerning the victim's propensity for veracity. The state objected, claiming that the defendant was attempting to use the records in an effort to avoid having to call a witness with actual knowledge of the incidents referenced in the records and, moreover, that the records were inadmissible as they "contain hearsay all over the place . . . ." In response to the state's objection, the defendant argued that the particular portion of the department's records met the requirements of the business records exception because the victim's foster parents had a duty to report to the department any information relevant to the care of the child, the department had an obligation to create a record of such reports and the department had made such a record contemporaneous with the report of the victim's foster parents. The defendant further asserted that particular evidence was relevant in order to demonstrate the "ongoing problem of [the victim's] truthfulness and her reputation for truth and veracity."

The trial court sustained the state's objection to the introduction of the evidence, concluding that the particular portion of the records sought to be admitted was irrelevant and, even if relevant, the defendant had failed to show that a witness with actual knowledge of the events contained in the record was unavailable and, therefore, the record did not qualify as a business record. Thereafter, outside the presence of the jury, the defendant identified certain other portions of the department's records claimed to be admissible pursuant to the business records exception; the trial court indicated that, as the defendant sought to admit these other

records on the same basis as the earlier proffer, the court's prior ruling as to the inadmissibility of the records would apply to all of the department's records offered by the defendant.[15]

In the appendices to their briefs before this court, the parties have reproduced for our review the pertinent portions of the department's records. At the outset, we note that the records consist of myriad entries made by department workers detailing conversations between the workers and the victim as well as between the workers and other individuals involved in the victim's life, including foster parents, therapists and physicians. The subject of these entries range from the victim's allegations of abuse against the defendant to her daily life and development in foster care. With specific regard to the allegations of abuse, our review of these records reveals the following: (1) several entries made by department workers were based upon conversations with the victim's foster mother in which the foster mother indicated that she believed that the victim had lied about the allegations of abuse, that the victim was constantly untruthful in her daily life, and that the victim believed people disliked her because she lied and that the victim had implied that she had fashioned her allegations of abuse against the defendant from a book on sexual abuse that she owned; (2) several entries, based upon conversations between department workers and the victim's physician, indicate that the victim's foster father had told the physician that the

_____

[15] The trial court allowed the defendant to identify those portions of the department's records claimed as admissible pursuant to the business records exception and identified such materials as sealed exhibit 25 for appellate review. We are aware that the trial court expressly indicated on the record that it had not reviewed all of the documents contained within exhibit 25. Rather, the court stated that, because the defendant had conceded the basis for admission of these records was the same as the earlier proffer, its prior ruling as to the inadmissibility of the records applied with equal force to all such records.

victim had made up the allegations of abuse, that the victim has a " 'flair for drama' " and tends to " 'exaggerate things,' " that the victim had called herself a pathological liar, had questioned whether the abuse actually occurred or whether she had dreamed it, and had referred to a book on sexual abuse while in the defendant's home, and that the victim tends to distort reality and come to believe her distorted perceptions; (3) other entries concern conversations between department workers and the victim's therapists in which the therapists indicated that the victim had stated that she acted in ways that would get her attention, that the victim had questioned her memories of the abuse and, when pressed by her physician for details, indicated that she may have given inaccurate information, and that the victim had stated that she is very sneaky with her foster parents; (4) another entry details a conversation between a worker and a Connecticut state trooper in which the trooper relayed the substance of a conversation between the victim's biological mother and the victim's foster mother in which the foster mother indicated that she did not believe the victim's allegations of abuse; (5) an entry in the records mentions a statement made by the victim's foster father that the victim had told him that the abuse really did occur but that she planned on lying to her physician and denying the abuse in order to return home; and (6) an entry made by a department worker references the victim's inquiry of the worker as to whether her family knew of her allegations of abuse against the defendant and whether they believed her. In addition to these entries, the records also contain many other worker entries unrelated to the allegations of abuse and instead focused upon the victim's development and events in her life while in foster care.

It is axiomatic that "[t]he trial court's ruling on the admissibility of evidence is entitled to great deference.

. . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998).

Our inquiry begins with the issue of whether the records satisfied § 52-180. The defendant, relies primarily upon our decision in *In re Barbara J.*, 215 Conn. 31, 39–42, 574 A.2d 203 (1990), in which we concluded that correspondence from a foster mother to a department worker regarding a causal connection between a foster child's disruptive behavior and visits with her biological mother were admissible pursuant to the business records exception. He contends that the records of the department regarding the victim are admissible pursuant to § 52-180 and, to the extent that the records contain multiple levels of hearsay, either fall within separate hearsay exceptions covering each level, or are not hearsay evidence. In response, the state claims that the records are not admissible pursuant to the business records exception because they contain multiple levels of hearsay, include statements made by persons without a business duty to report information regarding the victim, and contain statements of opinion made by persons whose qualifications to render an opinion regarding the victim have not been established. We conclude that because the records maintained by the department qualify as business records for the purposes of § 52-180, the trial court acted improperly.[16]

---

[16] We recognize that the defendant has, on appeal, advanced various bases on which, the defendant contends, the multiple levels of hearsay contained within the department's records either are covered by hearsay exceptions or are nonhearsay evidence. As the trial court never reached these issues, deciding instead, as a threshold matter, that the records did not fall within § 52-180, and because we subsequently conclude in this opinion that the

Section 52-180 (a) recognizes "the inherent trustworthiness of records on which businesses rely to conduct their daily affairs." *State* v. *Kirsch*, 263 Conn. 390, 400, 820 A.2d 236 (2003). "To be admissible under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in . . . § 52-180. The court must determine, before concluding that it is admissible, that the record was made in the regular course of business, that it was the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter. . . . In applying the business records exception, the statute [§ 52-180] should be liberally interpreted." (Internal quotation marks omitted.) *Calcano* v. *Calcano*, 257 Conn. 230, 240, 777 A.2d 633 (2001).

We conclude that the department's records satisfy the tripartite requirements of § 52-180. The records of the department were made in the regular course of business, it was within the regular course of the department's business to make such records, and the records were made at the time of the act described in the reports, or within a reasonable time thereafter. Indeed, beyond mere department practice, the department is statutorily *required* to maintain the type of records at issue in this matter. General Statutes § 17a-98 provides: "The [c]ommissioner of [the department], or any agent appointed by him, shall exercise careful supervision of each child under his guardianship or care and shall maintain such contact with the child and his foster family as is necessary to promote the child's safety and

---

trial court's evidentiary impropriety was harmful and that the defendant is entitled to a new trial, we will not now reach the defendant's proposed bases for admission of specific portions of the department's records, and instead leave it to the trial court, upon remand, to rule upon the admissibility of these records on a document-by-document basis in accordance with the principles articulated herein.

his physical, educational, moral and emotional development. The commissioner shall maintain such records and accounts as may be necessary for the proper supervision of all children under his guardianship or care." See also *In re Barbara J.*, supra, 215 Conn. 39–42 (concluding that foster parents are statutorily mandated to make reports to department with regard to supervision and care of foster children and department is statutorily required to maintain contact with such children and to create records necessary for proper supervision of children).

Moreover, the fact that the defendant's sole witness as to the creation of the records, D'Auteuil, personally did not create each entry in the victim's narrative and does not have personal knowledge of the particular events recorded in the entry does not impact the admissibility of the records under § 52-180. As § 52-180 (b)[17] expressly indicates, the failure of a party to produce a witness with personal knowledge of the creation of the record or the events contained within the record does not impact the admissibility of the record but, rather, properly impacts only the evidentiary weight to be afforded the record.[18]

---

[17] General Statutes § 52-180 (b) provides: "The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility."

[18] As the state concedes now on appeal, insofar as the trial court's exclusion of the department's records was based upon its conclusion that the defendant had failed to demonstrate the unavailability of a witness with personal knowledge of the creation of the record or the events contained within the record, the trial court was incorrect as a matter of law. For the purposes of the business records exception to the hearsay rule, the availability of a witness with such personal knowledge is immaterial. See General Statutes § 52-180 (b); see also Conn. Code Evid. § 8-4 (b).

Our conclusion that these records satisfy the requirements of § 52-180 does not, however, end the inquiry in which the trial court is to engage on remand. See footnote 16 of this opinion. "Once [the criteria of § 52-180] have been met by the party seeking to introduce the record . . . it does not necessarily follow that the record itself is generally admissible, nor does it mean that everything in it is required to be admitted into evidence. . . . For example, the information contained in the record must be relevant to the issues being tried. . . . In addition, the information contained in the report must be based on the entrant's own observation or on information of others whose business duty it is to transmit it to the entrant. . . . If the information does not have such a basis, it adds another level of hearsay to the report which necessitates a separate exception to the hearsay rule in order to justify its admission." (Citations omitted; internal quotation marks omitted.) *River Dock & Pile, Inc.* v. *O & G Industries, Inc.*, 219 Conn. 787, 794, 595 A.2d 839 (1991). Furthermore, we also have recognized that information contained in business records is only admissible pursuant to § 52-180 if the information is related to the "business" of the record's entrant. Consequently, in the context of hospital reports, we have concluded that only the portions of a hospital report associated with the "business" of a hospital, that is the information relevant to the medical treatment of a patient, are admissible pursuant to the business records exception. *Kelly* v. *Sheehan*, 158 Conn. 281, 285, 259 A.2d 605 (1969) (concluding that portion of hospital report revealing identity of driver who struck patient is not admissible). We have reached a similar result with regard to a physician's report and have stated that "[o]nce the report is ruled admissible under the statute, any information that is not relevant to medical treatment is subject to redaction by the trial court." *Aspiazu* v. *Orgera*, 205 Conn. 623, 628, 535 A.2d 338

(1987). In this instance, the trial court, in determining the admissibility of the department's records, is to evaluate whether the information contained in the records has a demonstrable nexus to the "business" of the department, as articulated in § 17a-98.

Although the business records are subject to redaction by the trial court on the grounds of relevancy, insufficient connection to the "business" of the department, or status as inadmissible hearsay,[19] the burden is upon the opponent of the evidence properly to object to any challenged portions of the records. "[O]nce a report qualifies as a business record, its proponent is not required to show the source of information for each item contained in the record. The burden is on the objecting party to specify objections to the inadmissible parts of the report." Id.

In this matter, having concluded that the department's records qualify as business records and that it was improper for the trial court to exclude them under § 52-180, we now must determine whether the defendant is entitled to a new trial because the exclusion of the records prejudiced the defendant. In this inquiry, the party bearing the burden of demonstrating prejudice, or harmlessness, depends upon whether the improper evidentiary ruling was of constitutional magnitude. "When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense." (Internal quotation marks omitted.) *State*

---

[19] To the extent that the statements of the victim's foster parents are opinions of the victim's veracity, such statements are also subject to our well settled standards with regard to opinion evidence. "A witness' character for veracity may also be proved by opinion evidence of those who have formed an opinion as to the character of the witness with respect to truth and veracity. . . . Whether a witness has had sufficient contact with a person to be qualified to testify as to a particular character trait is a matter peculiarly within the discretion of the trial court . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Gould*, 241 Conn. 1, 19, 695 A.2d 1022 (1997).

v. *King*, 249 Conn. 645, 668, 735 A.2d 267 (1999). If such a constitutional right is implicated, "[t]he state bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Conn*, 234 Conn. 97, 113, 662 A.2d 68 (1995). Conversely, if "the evidentiary impropriety is not constitutional in nature, the defendant bears the burden of demonstrating harm." *State* v. *Grenier*, 257 Conn. 797, 806–807, 778 A.2d 159 (2001).[20]

The defendant claims that the trial court's exclusion of the material adversely impacted his right to present a defense as protected by the federal and state constitutions.[21] In the alternative, the defendant contends that,

---

[20] "As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. . . . One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Grenier*, supra, 257 Conn. 807. Given that we conclude that the defendant has satisfied his burden of demonstrating harm under either of these standards, in the present context we need not resolve this split in authority.

[21] The sixth amendment to the United States constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

We have stated that "[t]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." (Internal quotation marks omitted.) *State* v. *Sandoval*, 263 Conn. 524, 541–42, 821 A.2d 247 (2003).

Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of

even if the exclusion of the evidence is not of constitutional magnitude, under our evidentiary standard of review in which the defendant bears the burden of demonstrating harmfulness, he can prevail. In response, the state, contending that the alleged impropriety does not rise to the level of a constitutional violation, asserts that the defendant has failed to demonstrate harm.

"Whether a trial court's erroneous restriction of [defense evidence] in a criminal trial deprives a defendant of his due process right to present a defense is a question that must be resolved on a case by case basis." *State* v. *Jones*, 205 Conn. 723, 731, 535 A.2d 808 (1988). Based upon the extensive cross-examination of the victim by the defendant,[22] we conclude that the trial court's exclusion of the department's records was not of constitutional magnitude and, accordingly, the defendant bears the burden of demonstrating harm.

On appeal, the defendant has shown harm flowing from the trial court's exclusion of the department's records and, accordingly, the defendant is entitled to a new trial. As our review of the trial transcript, in particular the testimony of the victim, and the records of the department that the defendant sought to admit into evidence demonstrates, much of the evidence contained within the department's files is qualitatively different from the other evidence used to impeach the victim at trial. Most glaringly, while much of the defendant's cross-examination of the victim centered upon the victim's misbehavior and propensity to lie in a gen-

---

the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf . . . and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. . . ."

Inasmuch as the defendant provides no independent analysis of his state constitutional claim, we limit our review to his federal constitutional claim. *State* v. *Sandoval*, supra, 263 Conn. 532 n.17.

[22] See footnote 14 of this opinion and accompanying text.

eral sense or in other instances, the information contained in the department's records evince, if believed by the trier of fact, a pattern of vacillations with regard to the very allegations of abuse for which the defendant was standing trial. Moreover, we are mindful that the records contain entries that indicate that the victim had remarked to several other individuals that she had begun to question whether her allegations of abuse were legitimate or whether she had imagined the incidents. At trial, the victim testified that she recalled making such a statement to her foster mother, but denied making such a statement to anyone else. When asked whether she had intimated such doubts to the individuals mentioned in the records, the victim responded in the negative. The records, therefore, would have been a particularly strong source of impeachment evidence as to the victim's credibility. Additionally, numerous entries in the records reference the victim's inconsistent statements with regard to the details of abuse, her statements that she would lie if she thought it necessary, and statements of the victim's physician as to the victim's capacity to distort reality and come to believe her distortions. These subjects are all highly relevant to the defendant's theory at trial: that the victim had concocted, intentionally or not, consciously or not, the allegations of abuse. This was not a case in which the state had numerous witnesses testify as to the allegations of abuse. The heart of the state's case against the defendant was the testimony of the victim and the testimony of witnesses to whom the victim had detailed her allegations of abuse.

Furthermore, our determination that the defendant was harmed by the trial court's exclusion of the department's records is guided by the various factors that we have articulated as relevant into the inquiry of evidentiary harmlessness. Whether an evidentiary error is harmless "depends upon a number of factors, such as

the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 174, 777 A.2d 604 (2001).

As to the first factor, the department's records contain material highly relevant to the accuracy of the testimony of the victim, the key witness for the state. Although the defendant did testify to the physical act of applying lotion to the victim's body on two occasions, the defendant denied fondling the victim's breasts or touching her for sexual gratification. The only evidence before the jury that the victim was fondled by the defendant, thereby meeting the element of "sexual contact" for the purposes of § 53a-73a (a) (1), came from the victim herself. With regard to the second factor, as indicated, we do not view the evidence contained in the department's records as cumulative because, the evidence is largely different in kind, and more focused upon the actual allegations of abuse, from the other credibility evidence that the defendant had used to impeach the victim. Moreover, the fact that there was a distinct dearth of evidence corroborating the testimony of the victim, and the fact that the department's records would serve to contradict her testimony, often through her own words, demonstrate that the state's case against the defendant was not particularly strong. Put simply, we believe the nature of the evidence contained in the department's records to be of a quality

such that the records may have a tendency to impact the determination of a jury as to the defendant's guilt or innocence and, therefore, their exclusion cannot be labeled as harmless.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court, and to remand the case to that court for a new trial.

In this opinion the other justices concurred.